**In re MTC ELECTRONIC TECHNOLOGIES SHAREHOLDERS LITIGATION.**

No. 93–CV–876 (JG).

United States District Court, E.D. New York.

Sept. 7, 1995.

Patricia M. Hynes, Sanford Dumain, Milberg, Weiss, Bershad, Hynes & Lerach, Jeffrey H. Squire, Kaufman, Malchman, Kirby & Squire, New York City, for plaintiffs.

Bruce S. Kaplan, Friedman & Kaplan, New York City, for Peter Jensen, Robert Farr, David Wong, Goodwin Wang, Thomas Lenagh, Edilberto Pozon.

Edward Westfield, Stults & Balber, New York City, for H.J. Meyers & Co.

Ronald D. Reynolds, Hill Wynne Troop & Meisinger, Los Angeles, California, for H.J. Meyers & Co.

Thomas I. Sheridan, III, Haythe & Curley, New York City, for MTC Electronic Technologies Co., Ltd.

James M. Ringer, Rogers & Wells, New York City, for Diawa Securities America, Inc.

Gregory A. Markel, Orrick, Herrington & Sutcliffe, New York City, for BDO Dunwoody Ward Mallette.

Richard C. Raymond, Braunschweig, Rachlis, Fishman & Raymond, P.C., New York City, for Alan Leung.

Jonathan D. Warner, Warner & Joselson, New York City, for Miko Leung and Sit Wa Leung.

## MEMORANDUM AND ORDER

GLEESON, District Judge.

The plaintiffs are purchasers of defendant MTC Electronic Technologies Co., Ltd. ("MTC") stock. They have brought this putative class action[1] against MTC, several of its officers and directors, its accountant and its underwriters, alleging violations of the federal securities laws. Two of the individual defendants are also charged with violating the Racketeer Influenced and Corrupt Organizations Act ("RICO").

In a hearing on April 15, 1994, the Hon. Reena Raggi denied defendants' motions to dismiss the complaint. Shortly thereafter, the Supreme Court decided *Central Bank N.A. v. First Interstate Bank*, —— U.S. ——, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), eliminating aider and abettor liability under Section 10(b) of the Securities Exchange Act of 1934. In light of the holding of *Central Bank*, Judge Raggi allowed the plaintiffs to amend their complaint. After the plaintiffs' amended their complaint, the defendants filed another round of motions to dismiss. The case was subsequently reassigned to this Court. On April 10, 1995, the Court issued an order stating that the defendants' renewed motions to dismiss were granted in part and denied in part and that this opinion, which sets forth the reasons for those rulings, would follow.

### Background

MTC is a Canadian corporation engaged in the importation, primarily into Canada and the United States, of consumer electronics. At the heart of this case is a series of representations by the defendants regarding purported joint venture agreements between MTC and various entities in the People's Republic of China. MTC claimed that these agreements would allow it to provide cellular telephone service and equipment to hundreds of millions of customers in China. In press statements and in filings with the Securities Exchange Commission ("SEC"), MTC asserted, among other things, that (1) the agreements gave MTC the exclusive right to provide cellular phone and paging services to 300 million people in China; (2) MTC would own and operate the cellular telephone networks to be created by the joint ventures; (3) MTC had developed the only pagers on the market capable of displaying Chinese characters; and (4) the agreements were final and legally binding contracts.

The plaintiffs contend that these statements were false, and that MTC had no binding agreements in China and no reasonable expectation of ever receiving revenues from such projects. They further contend that these false statements were made in order to artificially inflate the value of MTC stock in anticipation of a large stock and debt offering in late 1992. During the period in which these representations were made, the

1. A class has not yet been certified. Plaintiffs seek to represent all persons who purchased MTC stock between September 3, 1992 and February 22, 1993.

price of MTC stock skyrocketed from $5.00 per share to $30.00 per share.

It is further alleged that during this rise in the price of MTC stock, the Chief Executive Officer and President of MTC, Miko Leung, and his brother Sit Wa Leung, who was President of an MTC subsidiary and member of MTC's Board of Directors, illegally converted thousands of shares of MTC stock, realizing personal profits in the millions of dollars. Peter Jensen, a Director of MTC and a member of the Board of Directors' Audit Committee, also allegedly took advantage of the high price of MTC stock by exercising stock options, and netting a profit of $173,992.

Finally, the complaint alleges that when the truth about the "agreements" in China was brought to light, MTC's stock price tumbled, thereby injuring the named plaintiffs and the class members they hope to represent.

The plaintiffs have brought this action against MTC, Miko Leung, Sit Wa Leung, Peter Jensen, Alan Leung (the son of Sit Wa Leung and the Manager of MTC's Marketing Department), Robert Farr (Vice President of Marketing), Goodwin Wang (Vice President of Mobile Communications), David Wong (Executive Controller and Chief Financial Officer), Edilberto Pozon (Member of MTC's Board of Directors and the Board's Audit Committee), and Thomas Lenagh (Member of the Board of Directors since 1992 and a former member of the Audit Committee). In addition, the Plaintiffs have named as defendants Diawa Securities America, Inc. ("Diawa"), MTC's underwriter for its 1992 stock offering, H.J. Meyers & Co. ("H.J. Meyers"), the underwriter of MTC's 1991 stock offering, and BDO Dunwoody Ward Mallette ("Dunwoody"), a Canadian public accounting firm.

The complaint contains three counts. Count One accuses all of the defendants of violating Section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act") (15 U.S.C. § 78j), and Rule 10b–5 (17 C.F.R. § 240.10b–5), promulgated thereunder by the SEC. All of the defendants are alleged to be primary violators of the statute and the rule and to have conspired to violate those provi-sions. Count Two is brought against all of the individual defendants (Miko Leung, Sit Wa Leung, Alan Leung, Robert Farr, Goodwin Wang, David Wong, Edilberto Pozon, Peter Jensen and Thomas Lenagh), and alleges that they violated Section 20(a) of the Exchange Act in their capacity as "controlling persons" at MTC. Finally, Count Three alleges that Miko Leung and Sit Wa Leung violated the RICO statute, 18 U.S.C. § 1962(c), by participating in the conduct of the affairs of MTC through a pattern of racketeering activity involving mail fraud, wire fraud, securities fraud and the transportation of stolen securities.

With the exception of Diawa, all of the defendants have brought motions to dismiss. In all, seven motions have been made. Pozon and Jensen move to dismiss the complaint in its entirety for failure to plead fraud with particularity. Farr and Wang move to dismiss Count One for failure to state a claim of primary liability against them. MTC, Farr, Jensen, Wang, Lenagh, Pozon, and Wong (referred to herein collectively as the "MTC Defendants") move to dismiss Count One for failure to state a claim to the extent that it alleges a conspiracy to violate Section 10(b) and Rule 10b–5. Miko Leung and Sit Wa Leung move to dismiss the RICO count for failure to state a claim. Alan Leung moves to dismiss Counts One and Two for failure to plead fraud with particularity. H.J. Meyers moves to dismiss for failure to state a claim of primary liability against it or, in the alternative, to strike certain portions of the complaint. Finally, Dunwoody moves to dismiss for failure to state a claim of primary liability and for failure to plead fraud with particularity.

In passing on these motions to dismiss, I have a limited task. The allegations in the complaint must be accepted as true, and must be construed favorably to the plaintiffs. Further, the motions can be granted only if it appears beyond doubt that the plaintiffs can prove no set of facts entitling them to relief. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957).

It of course remains to be determined what the plaintiffs will actually be able to prove, but under the standard applicable here, I must accept their allegations that there was a massive fraud perpetrated by the defendants. Although allegations of such conduct are not unusual, some of the fraudulent conduct in this case has been admitted by MTC. For example, in March 1994, independent auditors and MTC's Board of Directors revealed that 1,110,000 shares of MTC stock that were supposed to have been issued in 1992 to engineers employed at the purported Chinese joint ventures were actually obtained by fraud and converted by Miko Leung or his brother Sit Wa Leung. The Leungs were subsequently fired and have been sued by MTC for their fraudulent conduct. Thus, MTC has admitted to massive fraud by its most senior management.

Further, MTC's Form 20–F Annual Report For Fiscal Year Ended January 31, 1994, reveals that the purported sales of 60,000 fax machines during 1991, 1992 and 1993 in fact did not occur. The company has told its shareholders that it believes that payments received for these fabricated "sales" came from companies controlled by former management. In addition, the company reported that a $1.25 million management fee, purportedly paid in connection with the fax machine "sales" and recorded as income in fiscal year 1992, was never paid to MTC. These and other revelations have required MTC to materially restate its financial statements for fiscal years 1991, 1992 and 1993.

### Discussion

A. *The Claimed Failure to Plead Fraud With Particularity (Pozon and Jensen)*

Defendants Edilberto Pozon and Peter Jensen move to dismiss the complaint for failure to meet the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. In allegations involving fraud, Rule 9(b) requires that "the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other conditions of mind of a person may be averred generally." Fed.R.Civ.P. 9(b).

 Rule 9(b) is a departure from the normal pleading requirements of the Federal Rules. In most cases, the rules merely require the plaintiff to plead a "short and plain statement" setting forth the allegations and grounds for relief. Fed.R.Civ.P. 8(a). The Second Circuit has held that the requirements of Rule 9(b) and Rule 8(a) "must be read together." *Ouaknine v. MacFarlane*, 897 F.2d 75, 79 (2d. Cir.1990).[2] At a minimum, a complaint claiming fraud "must allege the time, place, speaker, and sometimes even the content of the alleged misrepresentation." *Id.* As for scienter, a complaint alleging fraud must at least set out facts "giving rise to a 'strong inference' of fraudulent intent." *Id.* (citations omitted); *see also IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1057 (2d Cir.1993). In Section 10(b) cases, the Second Circuit has established two methods of properly pleading scienter:

[t]he requisite "strong inference" of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994).

 However, the Second Circuit has carved out an exception to this rule for "insiders and affiliates." If the defendants are insiders, then "'no specific connection between fraudulent representations ... and particular defendants is necessary.'" *DiVittorio v. Equidyne Extractive Indus.*, 822 F.2d 1242, 1247 (2d Cir.1987) (quoting *Luce v. Edelstein*, 802 F.2d 49, 54–55 (2d Cir. 1986)).

 The defendants, hoping to avoid the consequences of the "group pleading" permitted by *DiVittorio* and *Luce*, argue that

---

**2.** The particularity requirement serves three purposes: (1) it affords the defendants fair notice of the facts upon which the claim is based; (2) it safeguards the defendants' reputation and good-will from unfounded charges; and (3) it discourages "strike suits." *IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1057 (2d Cir.1993).

they are "outsiders," and that allegations that they were members of the audit committee and signed the prospectuses are insufficient. I find these arguments unconvincing,[3] and conclude that the allegations against Pozon and Jensen are sufficiently particularized to warrant the denial of the motion.

Pozon and Jensen are alleged to have signed prospectuses containing materially false and misleading information. Moreover, Pozon and Jensen together constituted the Audit Committee—a committee charged with the responsibility of overseeing the work of defendant BDO Dunwoody. As noted above, the plaintiffs' allegations—which I must regard as true—reveal fraud, theft of securities and the fabrication of financial information by senior management at MTC. In short, the complaint alleges massive accounting fraud during the class period. Considering that Pozon and Jensen were charged with overseeing the conduct of MTC's accountants. I would conclude that the complaint satisfies the requirements of Rule 9(b), even if the allegations against them were limited to their status at MTC and their signing of fraudulent prospectuses. *See Kimmel v. Labenski,* 1988 WL 19229, *4 (S.D.N.Y. Feb. 10, 1988) (holding that the signatories of a SEC 10–K forms are "insiders"); *Greenfield v. Professional Care, Inc.,* 677 F.Supp. 110, 114–15 (E.D.N.Y.1987) (board members who serve on the audit committee should be treated as corporate insiders). The motions of defendants Pozon and Jensen are therefore denied.[4]

## B. *The Claimed Failure To Plead A Primary Violation Of Section 10(b) (Farr and Wang)*

■ Defendants Robert Farr and Goodwin Wang move to dismiss Count One for failure to plead a primary violation against them under Section 10(b) of the Act.[5] The allegations against Farr and Wang are limited to their status as officers: Farr is a long-term insider at MTC, and Wang has been Executive Vice President for Marketing at MTC since 1988 and the company's Vice President for Mobile Communications since May of 1992.

Seizing upon *Central Bank,* Farr and Wang argue that, since no false statements are specifically attributed to them, they are not alleged to have committed a primary violation of Section 10(b). However, their argument fails because they have, in fact, been charged as primary violators.

Even assuming *arguendo* that a corporate insider must be personally responsible for a particular misstatement or manipulative device in order to be primarily liable—a proposition I do not accept—there is no reason to conclude that such responsibility must be specifically alleged in the complaint. Indeed, the rationale for the relaxed pleading re-

3. Judge Raggi reached the same conclusion in April 1994, when she denied an identical motion by the same defendants. Pozon and Jensen admit that this motion is not affected by *Central Bank* and is in fact simply a motion for reconsideration. In explaining their failure to timely file such a motion, they assert that Judge Raggi "expressed [her] preference for [addressing the argument to the Supplemental Complaint] when counsel stated their intention to seek reargument of the rulings in light of *Central Bank.*" MTC Defendants' Memorandum at 4 n. 2. However, the transcript to which they cite reveals that counsel for BDO Dunwoody, not Pozon and Jensen, suggested that procedure, and did so only with respect to the arguments affected by *Central Bank.* Transcript of April 21, 1994 at 88–90. In addressing the merits of the motion, I have given these defendants the benefit of whatever slight doubt that may have existed as to the scope of Judge Raggi's ruling.

4. Moreover, even assuming that the defendants were "outsiders" for the purposes of Rule 9(b),

the plaintiffs have pleaded their case with enough specificity to survive a motion to dismiss. First, the plaintiffs allege that Jensen exercised his stock options in the middle of the class period, selling 8,333 shares of MTC stock, which he had purchased at $5.38 per share, at $26.25 per share, thus netting him $173,993 in profit. Am. & Sup.Compl. ¶ 29(f). This allegation raises a "strong inference" of fraudulent intent and establishes a motive for the fraud. Similarly, the complaint alleges that Pozon was a substantial investor in MTC, helping the company to acquire a $10 million line of credit through another "entity" with which he was "affiliated." Plfs' Ind. Defs. Op. Mem. at 9 (citing Exhibit "C" to Affidavit of Richard Skaff, submitted in support of Dunwoody's motion to dismiss at 61).

5. These defendants have not moved to dismiss Count Two, which charges them with "control person" liability under Section 20(a).

quirements under Rule 9(b) suggests otherwise.

As discussed above, under the *Luce* line of cases, "no specific connection between fraudulent representations ... and particular defendants is necessary where ... defendants are insiders or affiliates participating in the offer of the securities in question." *Luce*, 802 F.2d at 55. Because Farr and Wang are insiders, the "group pleading" in the complaint is sufficient to survive a motion to dismiss.

The underlying purpose of allowing "group pleading" against insiders is that "a plaintiff may not be able to plead the precise role of each defendant when a group defendants has acted in concert ... Under those circumstances, it is appropriate to plead the actions of the group and leave the development of individual liability questions until some discovery has been undertaken, rather than to dismiss the plaintiff because he does not have what may be concealed information." *In re AnnTaylor Stores Securities Litig.*, 807 F.Supp. 990 (S.D.N.Y.1992) (quoting *Jackson v. First Fed. Sav. F.A.*, 709 F.Supp. 863, 878 (E.D.Ark.1988)). As Judge Raggi noted when she initially declined to dismiss the allegations against Farr and Wang:

> their positions within the company and the fraud alleged does give rise to questions about what they knew and whether they would have had to have known that the company was repeatedly putting out false statements. I simply do not know at this point what their control over the documents was, what their role in preparing any of them was.
>
> To the extent that the plaintiffs do not know either, I cannot say at this point that dismissal is the appropriate action.

Transcript of Proceedings dated April 15, 1994, at 113–14.

In short, I conclude that the complaint properly alleges a primary violation of Section 10(b) against Farr and Wang and that the inability to specify liability among such insiders on an individualized basis is neither surprising nor unreasonable at this stage. I therefore reaffirm Judge Raggi's denial of their motion to dismiss.

### C. The Motion To Dismiss the Conspiracy Allegations (MTC Defendants)

■ The MTC Defendants move to dismiss paragraph 169 of the complaint to the extent that it alleges a conspiracy to violate the securities laws. They argue that the reasoning of *Central Bank* requires the conclusion that conspiracy liability is unavailable in private claims under Section 10(b). I agree.

Every court that has decided this issue after *Central Bank* has adopted the position advanced by the MTC defendants. For instance, in *In re Ross Systems Securities Litigation*, 1994 WL 583114 (N.D.Cal. July 21, 1994), the court concluded "that the *Central Bank* rationale that prohibits implied aiding and abetting liability is applicable to implied conspiratorial liability and leads to the inevitable conclusion that conspiratorial liability for § 10(b) does not survive *Central Bank*." *Id.* at *4. The court noted that, like "aiding and abetting," "conspiracy" does not appear anywhere in the text of Rule 10(b). In addition, a claim of conspiracy does not require the conspirator to have actually committed a manipulative or deceptive act, and thus constitutes the type of "secondary" liability condemned by *Central Bank*. Finally, the *Ross* court noted that because the tort law elements of aiding and abetting and conspiracy are identical—both require a completed tort[6] and knowledge of the tort— every case in which a party could allege aiding and abetting could also support a claim of conspiracy. "It is beyond logic," the court concluded, "to maintain that although *Central Bank* prohibits aiding and abetting liability it permits plaintiffs to maintain the same cause of action by labelling it as a conspiracy." *Id.; see also In re Faleck & Margolies, Ltd.*, 1995 WL 33631 *12 (S.D.N.Y. Jan. 30, 1995); *In re Syntex Corp. Securities Litigation*, 855 F.Supp. 1086, 1098 (N.D.Cal.1994).

---

**6.** The court noted the distinction between criminal conspiracy and civil conspiracy: "[t]he crime of conspiracy may be inchoate, but there is no corollary inchoate tort of conspiracy. In civil cases conspiracy is a theory of liability available only when a completed tort exists." *Id.*

In sum, every reason cited by the Supreme Court, in rejecting the implied right of action for aiding and abetting also applies to actions alleging conspiracies. Accordingly, the MTC defendants' motion to strike the conspiracy allegations in paragraph 169 of the complaint is granted.

### D. The Challenge To The RICO Count (Miko Leung and Sit Wa Leung)

■ Miko Leung and Sit Wa Leung move to dismiss Count Three of the complaint, which alleges that they violated 18 U.S.C. § 1962(c), a provision in the RICO statute. Specifically, the Leungs are charged with conducting the affairs of MTC through a pattern of racketeering activity that included, among other racketeering acts, multiple violations of the federal securities laws. With respect to these latter racketeering acts, the plaintiffs' claim that the requisite element of reliance on the alleged misrepresentations is presumptively established by the plaintiffs' reliance on the integrity of the market, a theory endorsed by the Supreme Court in Basic, Inc., v. Levinson, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), and generally referred to as the "fraud on the market" theory.

The Leungs contend that, to the extent a RICO cause of action is based on such racketeering acts, it fails to satisfy the standing requirement of 18 U.S.C. § 1964(c), which confers a private civil action to any person "injured in his business or property by reason of a violation of Section 1962." The argument is based on Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1990).

Holmes involved the Securities Investor Protection Corporation ("SIPC"), a private nonprofit corporation established pursuant to a federal statute to provide financial protection to the customers of failed broker-dealers who are members of SIPC. SIPC had advanced nearly $13 million to the customers of two such broker-dealers, and brought a RICO claim against Holmes and others on the theory that their fraudulent activity had prevented the broker-dealers from satisfying their obligations to their customers, thus triggering SIPC's statutory duty to reimburse those customers. 503 U.S. at 260–64, 112 S.Ct. at 1314–15.

In rejecting SIPC's RICO claim, the Court focused on the distinction between injuries actually caused by RICO violations and those "proximately" caused them. As with any determination of proximate cause, this latter category is the result of a legal policy determination. As the Court in Holmes put it:

Here we use "proximate cause" to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts. At bottom, the notion of proximate cause reflects "ideas of what justice demands, or of what is administratively possible and convenient."

Id. at 268, 112 S.Ct. at 1318 (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 41. p. 264 (5th ed. 1984)). The Holmes Court concluded that in the civil RICO context, justice demands that a plaintiff demonstrate a direct relationship between the injury asserted and the RICO violation. Thus, a plaintiff whose alleged injury flows merely "from the misfortunes visited upon a third person by the defendant's acts" is too remote from those acts to recover. Id.

The Leungs assert that this requirement that RICO plaintiffs must be injured directly prohibits RICO claims in which the pattern of racketeering activity consists of securities violations that allege a "fraud on the market." This argument fails because it improperly equates indirect reliance with indirect injury. The fact that the plaintiffs may establish their reliance on the alleged fraudulent misstatements by reference to the integrity of the securities markets does not place them at a "different level[] of injury from the violative acts." Holmes, 503 U.S. at 269, 112 S.Ct. at 1318. Those markets exist for investors, and statements regarding a issuers' intentions or performance are meant to influence investor behavior. There is thus nothing "derivative" about the injury shareholders suffer through fraudulent representations made in order to manipulate those markets. See Standardbred Owners Ass'n v. Roosevelt Raceway, 985 F.2d 102, 104 (2d Cir.1993) (Holmes precludes claims of injury

that are "derivative of injury" to another). Nor do the Leungs' advance any policy reasons which would justify not holding them responsible for the injuries their fraudulent behavior caused MTC shareholders.

The Leungs' assertion that *Caviness v. Derand Resources Corp.*, 983 F.2d 1295 (4th Cir.1993), supports their argument is mistaken. *Caviness* did not address the fraud on the market means of establishing reliance. It did not even address Section 10(b). Rather, *Caviness* addressed the question of whether alleged violations of Section 12(2) of the Securities Act of 1933—which requires neither reliance nor damage—could constitute racketeering acts in a RICO count. It concluded that allegations that go no further than establishing a cause of action under Section 12(a) fail to state a RICO claim. 983 F.2d at 1304.

The Second Circuit has held that, when racketeering acts are grounded in fraud, the proximate cause requirement means that "in addition to showing that but for the defendant's misrepresentations the transaction would not have come about, the [plaintiff] must also show that the misstatements were the reason the transaction turned out to be a losing one." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994). The plaintiffs have satisfied this requirement. They were shareholders in MTC who purchased their stock because of the defendants' alleged misrepresentations. Indeed, the purpose of the alleged fraud was to artificially inflate the price of MTC stock by inducing such investments. Not only was the injury to the plaintiffs "reasonably foreseeable," but it was necessary to the success of the Leung's alleged scheme.

Finally, the Leungs contend that the rejection of their argument will mean that "every securities fraud case states a RICO claim." Leung Reply Memorandum at 1. However, the issue here is not, as the Leungs contend, whether securities fraud allegations that depend on a "fraud on the market" theory will automatically state a claim under RICO. Rather, the issue here is whether, when such securities claims constitute the alleged predicate acts of racketeering, a plaintiff who proves them *and the other elements of a cause of action under Section 1962(c)* is injured "by reason of" the RICO violation. I conclude that the answer is yes. Moreover, that answer does not convert every security fraud case into a potential RICO case because the other elements of the RICO cause of action, particularly the pattern requirement, may not be satisfied in many securities fraud cases. At any rate, even if the Leungs were correct, the argument that a broad construction of the RICO statute produces a large number of cases has never been warmly received, even when those cases (unlike securities actions) would not otherwise be in federal court. *See, e.g., Sedima, S.P.R.L. v. Imrex*, 473 U.S. 479, 499–501, 105 S.Ct. 3275, 3286–87, 3292–93, 87 L.Ed.2d 346 (1985) (if the extraordinary breadth of the RICO private action is a defect, it is for Congress, not the courts, to remedy); *id.* at 504, 105 S.Ct. at 3294 (Marshall, J., dissenting) (absent judicially-imposed restrictions, the RICO civil action "federalizes important areas of civil litigation that until now were solely within the domain of the States").

Because the securities fraud allegations in this case qualify as racketeering acts for the RICO claim notwithstanding the plaintiffs' use of the fraud on the market theory, the motion to dismiss the claim is denied.[7]

E. *The Claimed Failure To Plead Fraud With Particularity (Alan Leung)*

■ Like defendants Jensen and Pozon, Alan Leung moves to dismiss Count One of the complaint for failure to plead his role as a primary violator with sufficient particularity. Alan Leung further argues that Count Two fails to allege sufficiently his status as a "control person" under Section 20(a).

---

7. As for the other alleged racketeering acts, which relate to the defendants' fraudulent conversion of MTC stock, the plaintiffs may well have suffered only the sort of derivative injury which, under *Holmes*, may not sustain a RICO claim. The plaintiffs contend otherwise, alleging that all of the illegal conduct was part of an overall scheme to inflate the price of MTC stock. At this juncture, those allegations are deemed to be true, and the plaintiffs will be given an opportunity to prove them.

The complaint alleges that Alan Leung, the son of Sit Wa Leung, was MTC's Manager of Marketing from 1986 through the class period. Alan Leung marketed MTC's electronic products in the United States and was listed in numerous press releases as the contact person at MTC. Significantly, the company apparently believed that he was involved in the fraudulent conversion of millions of dollars' worth of MTC stock, as it named him as a defendant in a Hong Kong action to prevent the dissipation of the Leungs' assets, and suspended him from the company.[8]

These allegations are clearly sufficient to withstand a motion to dismiss. As Director of Marketing, as the son and nephew of the two most powerful officers of MTC, and as someone who clearly had at least peripheral involvement in the Chinese joint venture agreements, the plaintiffs have sufficiently pleaded Alan Leung's status as an "insider" to satisfy Rule 9(b)'s group pleading requirements.

▆▆▆ Alan Leung's second argument is that the plaintiffs have failed to properly allege that he is a "control person" under Section 20(a). Section 20(a) of the Act provides that:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a) (1995).

In order to establish Alan Leung's controlling status, the plaintiffs have alleged that "[b]ecause of his family relationship with Miko and Sit Wa Leung within the corporate environment of MTC, Alan Leung is also liable as a control person." Plfs.Op. to Leungs' Mem. at 23. Plaintiffs also allege the Alan Leung served as Director of Marketing through the class period and that he "was listed in numerous press releases from

MTC, distributed in the U.S. as the contact person at MTC." *Id.* Although these allegations are insufficient to establish Alan Leung's knowledge or participation in the alleged fraud at MTC, I agree with Judge Sand's statement in *Food & Allied Serv. Trades Dep't v. Millfeld Trading Co.,* 841 F.Supp. 1386, 1390 (S.D.N.Y.1994) that:

a requirement that plaintiffs allege more than control status confuses what is required to establish control liability at trial or summary judgment and what is required to make out a prima facie case of control liability at the pleading stage. Requiring plaintiffs to allege more than control status in their complaint would erroneously import into the pleading stage the Second Circuit's standard of proof at trial ... Thus, knowledge and culpability are not elements of a prima facie case; instead, their absence constitutes an affirmative defense.

841 F.Supp. at 1390. Plaintiffs have clearly alleged that Alan Leung had controlling status both because of his familial relationships with the two co-founders of MTC and because of his position as Director of Marketing. Alan Leung's motion to dismiss is therefore denied.

### F. *The Motion of H.J. Meyers.*

H.J. Meyers moves to dismiss the complaint for failing to allege that it is a primary violator of the securities laws. The plaintiffs have alleged that H.J. Meyers has primary liability arising out of two events: (1) it was the underwriter for MTC's November 1991 public offering, and as such participated in drafting and circulating the false and misleading registration statement and prospectus for that offering; and (2) on May 29, 1992, it issued to the investment community a Research Report on MTC setting forth in detail allegedly fraudulent information regarding the supposed joint ventures in China. The plaintiffs also assert that H.J. Meyers is liable for failing to correct materially false and misleading statements which it knew to be false at the time they were issued.

---

**8.** MTC now states that Alan Leung has been dismissed from that action.

### 1. *The Central Bank Decision.*

 The arguments advanced by H.J. Meyers, as well as those of BDO Dunwoody, place in clear relief the question created by *Central Bank's* elimination of aiding and abetting liability under Section 10(b): where is the line between secondary and primary liability?

To step back for a moment, it bears noting that even before *Central Bank,* there was not a clear answer to one of the critical questions pertaining to H.J. Meyers' motion—whether an underwriter can be held primarily liable for false statements in the issuer's prospectus. The cases that have addressed the issue generally produced mixed results. *Compare In re VMS Securities Litigation,* 752 F.Supp. 1373, 1394 & n. 18 (N.D.Ill.1990) (underwriters charged with participating in preparing materially false and misleading prospectuses could only be charged with aiding and abetting liability), *with Cooper v. Hwang,* 1987 WL 16949, at *4, 1987 U.S.Dist. LEXIS 14258 at *14 (N.D.Cal. April 20, 1987) (underwriters may be primarily liable for helping to draft prospectus). This uncertainty was neither surprising nor significant before *Central Bank,* however, because the distinction between primary and secondary liability was largely academic.

*Central Bank* has elevated this distinction to critical importance by eliminating secondary liability under Section 10(b). More precisely, the Court in *Central Bank* held, contrary to the established law in every federal circuit, that Congress had never imposed such liability.

The Central Bank of Denver was the indenture trustee for $26 million in bonds issued in 1986 and 1988 by a public building authority. The bonds were secured by landowner assessment liens that, according to bond covenants, had to be worth at least 160% of the bonds' outstanding principal and interest. The covenants further required the developer of the property to provide to Central Bank an annual report containing evidence that the 160% test was met. —— U.S. at ——, 114 S.Ct. at 1443.

In January 1988, the developer provided such assurances to Central Bank with respect to the security for the bonds to be issued in June 1988. However, Central Bank then became aware from two sources—the senior underwriter of the 1986 bonds and its own in-house appraiser—that a decline in property values suggested that the developer's assurances were suspect. Central Bank nevertheless agreed with the developer to postpone an independent review of its appraisal until after the bonds were issued. The bonds were issued in June 1988, the housing authority promptly defaulted on them, and certain purchasers sued Central Bank under Section 10(b) as an aider and abettor of a fraud perpetrated by the authority, the 1988 underwriter and the developer. *Id.* at ——, 114 S.Ct. at 1443.

The Supreme Court held that "§ 10(b) ... prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act.... The proscription does not include giving aid to a person who commits a manipulative or deceptive act." *Id.* at ——, 114 S.Ct. at 1448 (citations omitted). Accordingly, it concluded that summary judgment had been properly granted to Central Bank by the district court. *Id.* at ——, 114 S.Ct. at 1455.

Although it made clear that giving aid to a person who commits a securities fraud violation is not within the statute, the Court added:

> Because the text of § 10(b) does not prohibit aiding and abetting, we hold that a private plaintiff may not maintain an aiding and abetting suit under § 10(b). The absence of § 10(b) aiding and abetting liability does not mean that secondary actors in the securities markets are always free from liability under the securities Acts. Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5, assuming *all* of the requirements for primary liability under Rule 10b-5 are met. In any complex securities fraud, moreover, there are likely to be multiple violators; in this case, for example, respondents named four defendants as primary violators.

*Id.* at ——, 114 S.Ct. at 1455 (emphasis in original; citations omitted).

*Central Bank* thus made the distinction between primary and secondary liability extremely important. Unfortunately, the lower court decisions that attempt to define and apply that distinction have reached inconsistent results. Some courts have held that a third party's review and approval of documents containing fraudulent statements is not actionable under Section 10(b) because one must *make* the material misstatement or omission in order to be a primary violator. *See, e.g., In re Kendall Square Research Corporation Securities Litigation,* 868 F.Supp. 26, 28 (D.Mass.1994) (accountant's "review and approval" of financial statements and prospectuses insufficient); *Vosgerichian v. Commodore International,* 862 F.Supp. 1371, 1378 (E.D.Pa.1994) (allegations that accountant "advised" and "guid[ed]" client in making allegedly fraudulent misrepresentations insufficient).

Other cases have held that third parties may be primarily liable for statements made by others in which the defendant had significant participation. *See, e.g., In re Software Toolworks,* 50 F.3d 615, 628 n. 3 (9th Cir. 1994) (accountant may be primarily liable based on its "significant role in drafting and editing" a letter sent by the issuer to the SEC); *Adam v. Silicon Valley Bancshares,* 884 F.Supp. 1398, 1400 (N.D.Cal.1995) (accountant may be held primarily liable based on financial statements, press statements and reports of issuer); *In re U.S.A. Classic Securities Litigation,* 1995 WL 363841 at *5 (S.D.N.Y. June 19, 1995) (allegation that underwriter participated in issuance of prospectus and thereby employed a deceptive device is sufficient); *In re ZZZZ Best Securities Litigation,* 864 F.Supp. 960, 970 (C.D.Cal. 1994) (an accounting firm that was "intricately involved" in the creation of false documents and their "resulting deception" is a primary violator of Section 10(b)); *Cashman v. Coopers & Lybrand,* 877 F.Supp. 425, 432–34 (N.D.Ill.1995) (primary liability was alleged where "accountant was charged with playing a central role in the drafting and formation of the alleged misstatements" which were incorporated into the prospectus); *Employers Insurance of Wausau v.*

*Musick, Peeler & Garrett,* 871 F.Supp. 381, 389–90 (S.D.Cal.1994) (attorneys and accountants may be primarily liable for assisting in the preparation of false statements of the issuer).

At first blush, these cases seem to suggest two distinct approaches. On the one hand, some courts have adopted a bright line rule: if the defendant did not actually make the alleged misleading statement, it cannot be primarily liable no matter how much assistance the defendant may have rendered to those who did. On the other hand, some courts have adopted a rule that focuses on the degree of help rendered, holding that a defendant may be found primarily liable for statements of others in which the defendant substantially participated. Upon closer scrutiny, however, these different approaches start to blur. Some of the courts that seem to have adopted the bright line rule have nevertheless suggested that if the third party's assistance includes the preparation of a *draft* of the offending statement, primary liability can attach even if the final version is not a statement actually made by the defendant. *In re Kendall Square,* 868 F.Supp. at 28 (citing *In re Software Toolworks,* 38 F.3d 1078, 1090 n. 3 (9th Cir.1994)). Indeed, even when such drafting assistance has been rejected as a basis of primary liability, some courts have declined to grant dismissals in order to ensure that possible violators are not "hastily dismissed." *Walco Investments, Inc. v. Thenen,* 881 F.Supp. 1576, 1582 (S.D.Fla.1995) ("[t]he Court does not refute the cases cited by [the parties] for the proposition that lawyers who merely assist in drafting offering documents do not commit securities violations because of any misstatements or omissions in the offering document. However, further factual development on what the law firms knew and when they knew it is necessary.") Another decision suggests that even though an underwriter cannot be held primarily liable for false statements it did not actually make, such liability could be based on the dissemination of false statements made by others. *In re College Bound Consolidated Litigation,* 1994 WL 172408, at *4–5, 1994 U.S.Dist. LEXIS 5756 *14 (S.D.N.Y. May 4, 1994).

In short, *Central Bank* has generated a fair amount of confusion in the lower courts both in identifying the line between primary and secondary liability and in determining whether that distinction should be implemented on a motion to dismiss or on a motion for summary judgment. After considering these approaches, I conclude that if *Central Bank* is to have any real meaning, a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b). Anything short of such conduct is merely aiding and abetting, and no matter how substantial that aid may be, it is not enough to trigger liability under Section 10(b).

### 2. *The Claim Based On The 1991 Prospectus*

█ Plaintiffs have alleged that H.J. Meyers participated in drafting and circulating the prospectus for MTC's November 1991 public offering. There is no allegation that H.J. Meyers made any of the allegedly fraudulent representations in that prospectus. Indeed, there is no allegation that it did anything that is not done by lead underwriters with respect to all such public offerings. Again, I conclude that this is precisely the sort of role in an alleged 10(b) violation that, according to *Central Bank*, is no longer actionable. Accordingly, to the extent that Count One seeks to impose liability on H.J. Meyers based on its role in preparing and disseminating the November 1991 prospectus, it is hereby dismissed.

H.J. Meyers' motion to strike those allegations, however, is denied. As set forth below, the complaint does allege a primary violation of Section 10(b) against H.J. Meyers, and the factual allegations relating to the 1991 prospectus may properly be proved in support of that claim.

### 3. *The Claim Based On The Research Report*

█ The plaintiffs also seek to hold H.J. Meyers liable for its dissemination of a research report about MTC on May 29, 1992, three months before the beginning of the class period. The allegedly fraudulent statements in the report (which relate to the purported joint ventures in China and the revenues those joint ventures were expected to generate) are statements by H.J. Meyers itself, and thus may support an allegation of primary liability.

H.J. Meyers challenges the plaintiffs' claim that the misleading report was a cause in the rise in MTC stock during the class period. Under normal circumstances, plaintiffs in securities cases do not have to make precise allegations of causation in order to plead a primary violation under Section 10(b). *In re Crazy Eddie Securities Litigation*, 817 F.Supp. 306, 312 (E.D.N.Y.1993). However, H.J. Meyers points out that shortly after the release of its research report, the price of MTC's stock declined for several months. Because plaintiff's fraud on the market theory is premised on an efficient market, *Basic*, 485 U.S. at 246, 108 S.Ct. at 991, H.J. Meyers argues that its research report could not, as a matter of law, have caused the "spike" in MTC's stock price during the class period. The plaintiffs vigorously dispute this assertion, arguing that the research report contributed to the "totality of the circumstances" which caused the market price of MTC stock to rise.

This dispute strikes me as particularly unsuited for resolution on a motion to dismiss. What role, if any, H.J. Meyers' research report played in the rise of MTC's stock price is an issue of fact. Accordingly, the motion to dismiss this claim is denied.

### 4. *H.J. Meyers' Failure To Correct False Statements.*

█ Finally, H.J. Meyers argues that it cannot be held liable for failing to correct the allegedly false and misleading statements contained in MTC's prospectus and H.J. Meyer's research report. Since H.J. Meyers cannot be held liable as a primary violator for statements contained in MTC's 1991 prospectus, logic dictates that it cannot be held liable for failing to correct those statements.

█ The plaintiffs also claim, however, that H.J. Meyers had a duty to correct the statements it knew to be false in its 1991

research report.[9] As a general matter, courts have held that underwriters do not have a duty to correct statements made by an issuer in a prospectus which the underwriter learns to be false and misleading after the underwriter's involvement with the issuing company has ceased. *See In re Chaus Securities Litigation,* 1990 WL 188921, at *13, 1990 U.S.Dist. LEXIS 15810 at *35, Fed.Sec.L.Rep. (CCH) ¶ 95, 646 (S.D.N.Y. Nov. 20, 1990); *Hudson v. Capital Management Int'l, Inc.,* 565 F.Supp. 615, 623 (N.D.Cal.1983). However, an issuer has a duty to correct its own statements which become materially false or misleading. *IIT v. Cornfeld,* 619 F.2d 909, 927 (2d Cir.1980); *In re Phillips Petroleum Sec. Litigation,* 881 F.2d 1236 (3d Cir.1989); *Roeder v. Alpha Industries, Inc.,* 814 F.2d 22, 26–27 (1st Cir. 1987). Courts have also held that professionals such as accountants may have a duty to correct their own statements which later become false or misleading. *Rudolph v. Arthur Andersen & Co.,* 800 F.2d 1040 (11th Cir.1986); *Sharp v. Coopers & Lybrand,* 83 F.R.D. 343, 345 (E.D.Pa.1979).

Here, H.J. Meyers had underwritten an MTC public offering, held warrants of MTC stock, issued a research report praising the company and was quoted in a *Business Week* article lauding MTC during the class period. Under these circumstances, H.J. Meyers may be held liable as a primary violator for failing to correct its own statements which became materially false and misleading.

### G. *The Motion of BDO Dunwoody.*

Dunwoody moves to dismiss the complaint on the ground that it does not properly allege that Dunwoody is a primary violator of Section 10(b). Specifically, Dunwoody asserts that the plaintiffs have not alleged facts sufficient to establish either its scienter or the existence of any material misstatements by Dunwoody.

■ Dunwoody's claim that the plaintiffs have not alleged that it made any materially false and misleading statements is incorrect. In fact, the complaint alleges that Dunwoody issued unqualified audit opinions on MTC's 1991 and 1992 financial statements and consented to the inclusion of these opinions in MTC's 1992 10–K statement, a registration statement and six prospectuses filed during the class period. It is further alleged that Dunwoody materially misstated MTC's results of operations and net income, outstanding shares and options and the nature and extent of its business, and that Dunwoody materially misrepresented that it had performed its audit in accordance with generally accepted auditing standards. These allegations are sufficient to state a claim against Dunwoody as a primary violator. *See Vosgerichian,* 862 F.Supp. 1371, 1378 (E.D.Pa. 1994) (dismissing claims against accountant based on misrepresentations made by client, but holding that accountant's unqualified opinion could be the basis of primary liability); *In re Kendall Square,* 868 F.Supp. at 28–29 (same).

Dunwoody's second argument is that, in light of *Central Bank,* the plaintiffs have failed to properly plead scienter. As noted above, in order to properly allege scienter under Section 10(b), a plaintiff must allege facts that either show that the defendant had motive and opportunity to commit fraud or constitute strong circumstantial evidence that the defendant acted knowingly or recklessly. *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128–30 (2d. Cir.1994).

■ Dunwoody argues, however, that *Central Bank's* strict textual reading of Section 10(b) compels the conclusion that the scienter element can no longer be established by a showing of mere recklessness. This is particularly true, Dunwoody adds, with respect to secondary actors, such as accountants. Dunwoody contends that "the clear message of *Central Bank* was to narrow the liability against such secondary actors, not expand it through concepts like 'recklessness' which are not even in the statute." Dunwoody Mem. at 19–20.

It is true that *Central Bank* signals a general unwillingness to interpret Section

---

9. H.J. Meyers argues that the complaint does not allege a failure to correct its own materially false and misleading statements. I disagree, and conclude that ¶ 168 of the complaint includes such an allegation.

10(b) expansively. However, *Central Bank* did not address the scienter requirement, and the Second Circuit—in a decision post-dating *Central Bank*—has reaffirmed recklessness as a means of establishing scienter. *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128–29 (2d Cir.1994).

The plaintiffs have alleged both a motive and an opportunity for Dunwoody to commit fraud, as well as circumstantial evidence which points to recklessness on the part of Dunwoody. First, the plaintiffs allege that Dunwoody's conduct must have been intentional or willfully blind because of Dunwoody's (a) apparent failure to detect the massive stock embezzlement scheme of the Leungs despite its audit of MTC's stock option program; (b) statement indicating that MTC had exclusive contracts with the Chinese government, and (c) repeated correction of its auditing statements covering the class period.

Second, the plaintiffs allege that Dunwoody had a motive to turn a blind eye to the fraud going on around it: aiding the firm in raising capital for its Chinese joint venture and the promise of future profits. There is disagreement over whether motive may be established by a professional's alleged desire for future fees. *Compare Bernstein v. Crazy Eddie,* 702 F.Supp. 962, 977 (E.D.N.Y.1988) (finding that accountant "gained from its alleged role in the preparation of the misleading statements the continued patronage and goodwill of its client"), *with Friedman v. Arizona World Nurseries, Ltd.,* 730 F.Supp. 521, 532 (S.D.N.Y.1990) (motive may not be established merely from alleging that the firm was compensated for its professional services).

However, considering that the plaintiffs have alleged fraud of such an enormous scope and degree at MTC, I need not address the sufficiency of the allegations of motive. Instead, I find that the allegations of fraud, if proven, are alone sufficient to permit the jury to infer that Dunwoody was at least willfully blind to the fraud. As the court stated in *In re Leslie Fay Companies, Inc.,* 835 F.Supp. 167 (S.D.N.Y.1993), "when tidal waves of accounting fraud are alleged, it may be determined that the accountant's fail-

ure to discover his client's fraud raises an inference of scienter on the face of the pleading." *Id.* Accordingly, Dunwoody's motion to dismiss is denied.

## Conclusion

For the reasons stated above, and in accordance with this Court's ruling of April 10, 1995:

(a) the motion by Edilberto Pozon and Peter Jensen to dismiss the complaint for failure to plead fraud with particularity is DENIED;

(b) the motion by Robert Farr and Goodwin Wang to dismiss Count One for failure to state a claim against them is DENIED;

(c) the motion by MTC, Robert Farr, Peter Jensen, Goodwin Wang, Thomas Lenagh, Edilberto Pozon and David Wong to dismiss Count One for failure to state a claim is GRANTED to the extent that it alleges a conspiracy to violate Section 10(b) of the Securities Act of 1933;

(d) the motion by Miko Leung and Sit Wa Leung to dismiss Count Three for failure to state a claim is DENIED;

(e) the motion by Alan Leung to dismiss the complaint for failure to plead fraud with particularity is DENIED;

(f) the motion by H.J. Meyers to dismiss Count One of the complaint for failure to state a claim is GRANTED only to the extent that Count One is based on H.J. Meyers' preparation or drafting of MTC's November 1991 prospectus. In all other respects, H.J. Meyers' motion to dismiss is DENIED; and

(g) the motion by BDO Dunwoody to dismiss the complaint for failure to state a claim and for failure to plead fraud with particularity is DENIED.

So Ordered.