09-1619-cv
Pacific Investment Management Company LLC v. Mayer Brown

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term, 2009

(Argued: December 14, 2009                    Decided: April 27, 2010)

Docket No. 09-1619-cv

PACIFIC INVESTMENT MANAGEMENT COMPANY LLC and RH CAPITAL ASSOCIATES LLC,

*Plaintiffs-Appellants*,

PIMCO FUNDS: PACIFIC INVESTMENT MANAGEMENT SERIES, ET AL.,

*Plaintiffs*,

v.

MAYER BROWN LLP and JOSEPH P. COLLINS,

*Defendants-Appellees*,

REFCO INC., ET AL.,

*Defendants.**

Before: CABRANES and PARKER, *Circuit Judges*, and AMON, *District Judge.***

Plaintiffs-appellants appeal from a judgment of the District Court (Gerard E. Lynch, *Judge*) dismissing their claims for securities fraud against defendants-appellees, a law firm and one of its attorneys. We consider here (1) whether a corporation's outside counsel can be liable for false statements those attorneys allegedly create, but which were not attributed to the law firm or its

---

\* The Clerk of Court is directed to amend the official caption to conform to the listing of the parties stated above.

\*\* The Honorable Carol B. Amon, of the United States District Court for the Eastern District of New York, sitting by designation.

attorneys at the time the statements were disseminated; and (2) whether plaintiffs' claims that defendants participated in a scheme to defraud investors are foreclosed by the Supreme Court's decision in *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008).

We hold that a secondary actor can be held liable for false statements in a private damages action for securities fraud only if the statements are attributed to the defendant at the time the statements are disseminated. We further hold that plaintiffs' claims that defendants participated in a scheme to defraud investors are not meaningfully distinguishable from the claim at issue in *Stoneridge*, and, therefore, were properly dismissed.

Affirmed.

Judge Parker concurs in the judgment and in the opinion of the Court and files a separate concurring opinion.

JAMES J. SABELLA (Stuart M. Grant, Brenda F. Szydlo, Megan D. McIntyre, and Christine M. Mackintosh, *on the brief*), Grant & Eisenhoffer P.A., New York, NY, and Wilmington, DE, *for plaintiff-appellant Pacific Investment Management Company LLC.*

John P. Coffey (Salvatore J. Graziano, John C. Browne, Elliott Weiss, Ann M. Lipton, and Jeremy P. Robinson, *on the brief*), Bernstein Litowitz Berger & Grossmann LLP, New York, NY, *for plaintiff-appellant RH Capital Associates LLC.*

JOHN K. VILLA (George A. Borden and Craig D. Singer, *on the brief*), Williams & Connolly LLP, Washington, DC, *for defendant-appellee Mayer Brown LLP.*

William J. Schwartz (Jonathan P. Bach and Kathleen E. Cassidy, *on the brief*), Cooley Godward Kronish LLP, New York, NY, *for defendant-appellee Joseph P. Collins.*

Christopher Paik, Special Counsel (David M. Becker, General Counsel, and Jacob H. Stillman, Solicitor, *on the brief*), Securities and Exchange Commission, Washington, DC, *for amicus curiae the Securities and Exchange Commission.*

David M. Cooper (Donald B. Ayer and Peter J. Romatowski, *on the brief*), Jones Day, New York, NY, and Washington, DC, *for amicus curiae Law Firms in support of appellees.*

Erik S. Jaffe, Erik S. Jaffe, P.C., Washington, DC, *for amicus curiae former SEC Commissioners and Officials, Law and Finance Professors, and Securities Law Practitioners in support of appellees.*

Lucian T. Pera (Brian S. Faughnan, *on the brief*), Adams and Reese, LLP, Memphis, TN (Susan Hackett, Senior Vice President and General Counsel, Association of Corporate Counsel, Washington, DC, *on the brief*), *for amicus curiae Association of Corporate Counsel in support of appellees.*

Gary A. Orseck (Lawrence S. Robbins, Roy T. Englert, Alan E. Untereiner, Katherine S. Zecca, and Damon W. Taaffe, *on the brief*), Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP, Washington, DC (Robin S. Conrad and Amar D. Sarwal, National Chamber Litigation Center, Washington, DC, *on the brief*), *for amicus curiae Chamber of Commerce of the United States of America in support of appellees.*

JOSÉ A. CABRANES, *Circuit Judge*:

This appeal presents primarily two questions about the scope of federal securities laws:

(1) whether, under § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b-5 ("Rule 10b-5"), 17 C.F.R. § 240.10b-5, a corporation's outside counsel can be liable for false statements that those attorneys allegedly create, but which are not attributed to the law firm or its attorneys at the time the statements were disseminated; and (2) whether plaintiffs' claims that defendants participated in a scheme to defraud investors are foreclosed by the Supreme Court's decision in *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008).

Plaintiffs-appellants, Pacific Investment Management Company, LLC and RH Capital

3

Associates, LLC (jointly, "plaintiffs") appeal from a judgment of the United States District Court for the Southern District of New York (Gerard E. Lynch, *Judge*) dismissing their claims against defendants-appellees Mayer Brown, LLC ("Mayer Brown"), a law firm, and Joseph P. Collins ("Collins"), a former partner at Mayer Brown. Plaintiffs alleged that defendants violated federal securities laws in the course of representing the now-bankrupt brokerage firm Refco Inc. ("Refco"). Specifically, they claimed that defendants (1) facilitated fraudulent transactions between Refco and third parties for the purpose of concealing Refco's uncollectible debt and (2) drafted portions of Refco's security offering documents that contained false information. Although defendants allegedly created false statements that investors relied upon, all of those statements were attributed to Refco, and not Mayer Brown or Collins, at the time of dissemination.

We hold that a secondary actor[1] can be held liable in a private damages action brought pursuant to Rule 10b-5(b) only for false statements attributed to the secondary-actor defendant at the time of dissemination. Absent attribution, plaintiffs cannot show that they relied on defendants' *own* false statements, and participation in the creation of those statements amounts, at most, to aiding and abetting securities fraud. We further hold that plaintiffs' claims that defendants participated in a scheme to defraud investors are not meaningfully distinguishable from the claim at issue in *Stoneridge*, and therefore were properly dismissed.

## BACKGROUND

In reviewing the District Court's dismissal of an action pursuant to Fed. R. Civ. P. 12(b)(6), we accept as true the following nonconclusory allegations set forth in plaintiffs' Second Amended

---

[1] We use the term "secondary actor" to refer to lawyers (such as defendants), accountants, or other parties who are not employed by the issuing firm whose securities are the subject of allegations of fraud. *See Stoneridge*, 552 U.S. at 166 (using the term "[s]econdary actors" to refer to an issuing firm's customers and suppliers); *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994) (characterizing "lawyer[s], accountant[s], or bank[s]" as "secondary actors").

Complaint.  *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009); *South Cherry Street, LLC v. Hennessee Group LLC*, 573 F.3d 98, 100 (2d Cir. 2009).  This case arises from the 2005 collapse of Refco, which was once one of the world's largest providers of brokerage and clearing services in the international derivatives, currency, and futures markets.  According to plaintiffs, Mayer Brown served as Refco's primary outside counsel from 1994 until the company's collapse.  Collins, a partner at Mayer Brown, was the firm's primary contact with Refco and the billing partner in charge of the Refco account.  Refco was a lucrative client for Mayer Brown and Collins' largest personal client.

As part of its business model, Refco extended credit to its customers so that they could trade on "margin"—*i.e.*, trade in securities with money borrowed from Refco.  In the late 1990s, Refco customers suffered massive trading losses and consequently were unable to repay hundreds of millions of dollars of margin loans extended by Refco.  Concerned that properly accounting for these debts as "write-offs" would threaten the company's survival, Refco, allegedly with the help of defendants, arranged a series of sham transactions designed to conceal the losses.

Specifically, plaintiffs allege that Refco transferred its uncollectible debts to Refco Group Holdings, Inc. ("RGHI")—an entity controlled by Refco's Chief Executive Officer—in exchange for a receivable purportedly owed from RGHI to Refco.  Recognizing that a large debt owed to it by a related entity would arouse suspicion with investors and regulators, Refco, allegedly with the help of defendants, engaged in a series of sham loan transactions at the end of each quarter and each fiscal year to pay off the RGHI receivable.  It did so by loaning money to third parties, who then loaned the same amount to RGHI, which in turn used the funds to pay off Refco's receivable.  Days after the fiscal period closed, all of the loans were repaid and the third parties were paid a fee for their participation in the scheme.  The result of these circular transactions was that, at the end of financial periods, Refco reported receivables owed to it by various third parties rather than the related entity RGHI.

5

Mayer Brown and Collins participated in seventeen of these sham loan transactions between 2000 and 2005, representing both Refco and RGHI. According to plaintiffs, defendants' involvement included negotiating the terms of the loans, drafting and revising the documents relating to the loans, transmitting the documents to the participants, and retaining custody of and distributing the executed copies of the documents.

Plaintiffs also allege that defendants are responsible for false statements appearing in three Refco documents: (1) an Offering Memorandum for an unregistered bond offering in July 2004 ("Offering Memorandum"), (2) a Registration Statement for a subsequent registered bond offering ("Registration Statement"), and (3) a Registration Statement for Refco's initial public offering of common stock in August 2005 ("IPO Registration Statement"). Each of these documents contained false or misleading statements because they failed to disclose the true nature of Refco's financial condition, which had been concealed, in part, through the loan transactions described above.

Defendants allegedly participated in the creation of the false statements contained in each of the documents identified above. Collins and other Mayer Brown attorneys allegedly reviewed and revised portions of the Offering Memorandum and attended drafting sessions. Collins and another Mayer Brown attorney also personally drafted the Management Discussion & Analysis ("MD&A") portion of the Offering Memorandum, which, according to plaintiffs, discussed Refco's business and financial condition in a way that defendants knew to be false. The Offering Memorandum was used as the foundation for the Registration Statement, which was substantially similar in content. According to plaintiffs, defendants further assisted in the preparation of the Registration Statement by reviewing comment letters from the Securities and Exchange Commission ("SEC") and participating in drafting sessions. Finally, plaintiffs allege that defendants were directly involved in reviewing and drafting the IPO Registration Statement because they received, and presumably reviewed, the SEC's comments on

6

that filing.

Both the Offering Memorandum and the IPO Registration Statement note that Mayer Brown represented Refco in connection with those transactions. The Registration Statement does not mention Mayer Brown. None of the documents specifically attribute any of the information contained therein to Mayer Brown or Collins.

Plaintiffs, who purchased securities from Refco during the period that defendants were allegedly engaging in fraud, commenced this action after Refco declared bankruptcy in 2005. They asserted claims for violation of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, along with claims for "control person" liability under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

The District Court dismissed plaintiffs' claims against Mayer Brown and Collins pursuant to Fed. R. Civ. P. 12(b)(6). *See In re Refco, Inc. Sec. Litig.*, 609 F. Supp. 2d 304 (S.D.N.Y. 2009). With respect to plaintiffs' claim that defendants violated Rule 10b-5(b) by drafting and revising portions of Refco's public documents, the Court found that no statements in those documents were attributed to defendants and that plaintiffs had therefore alleged conduct akin to aiding and abetting, for which securities laws provide no private right of action. *See id.* at 311-14. The District Court also dismissed plaintiffs' Rule 10b-5(a) and (c) claims for "scheme liability" upon concluding that the Supreme Court's decision in *Stoneridge* foreclosed that theory of liability. *See id.* at 314-19. Finally, the District Court dismissed plaintiffs' § 20(a) claims because plaintiffs failed adequately to plead an underlying violation of federal securities law. *See id.* at 319.

## DISCUSSION

We review *de novo* a District Court's dismissal for failure to state a claim, *see* Fed. R. Civ. P. 12(b)(6), assuming all well-pleaded, nonconclusory factual allegations in the complaint to be true. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009); *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir.

7

2009).

This appeal concerns the scope of the private right of action available under § 10(b) of the Exchange Act and Rule 10b-5 (hereinafter, "Rule 10b-5 liability"). Section 10(b) makes it unlawful "for any person, directly or indirectly, . . . [t]o use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5, promulgated thereunder, provides as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
>> (a) To employ any device, scheme, or artifice to defraud,
>>
>> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>>
>> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

The Supreme Court has held that, to maintain a private damages action under § 10(b) and Rule 10b-5,

> a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.

*Stoneridge*, 552 U.S. at 157 (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)).

This appeal raises primarily two issues regarding the scope of Rule 10b-5 liability in private actions: (1) whether defendants can be liable under Rule 10b-5(b) for false statements that they

allegedly drafted, but which were not attributable to them at the time the statements were disseminated; and (2) whether the allegations in the complaint are sufficient to state a claim for "scheme liability" under Rule 10b-5(a) and (c).[2]

## I.    Plaintiffs' Rule 10b-5(b) Claim

Plaintiffs assert that the District Court erred in holding that attorneys who participate in the drafting of false statements cannot be liable in a private damages action if the statements are not attributed to those attorneys at the time of dissemination.  Along with the SEC as *amicus curiae*, plaintiffs argue that attribution is only one means by which attorneys and other secondary actors can incur liability for securities fraud.  They urge us to adopt a "creator standard" and hold that a defendant can be liable for *creating* a false statement that investors rely on, regardless of whether that statement is attributed to the defendant at the time of dissemination.  According to the SEC, "[a] person creates a statement . . . if the statement [1] is written or spoken by him, or [2] if he provides the false or misleading information that another person then puts into the statement, or [3] if he allows the statement to be attributed to him."  Brief for SEC as Amicus Curiae Supporting Plaintiffs-Appellants ("SEC Br.") at 7.[3]

Defendants respond that, under our precedents, attorneys who participate in the drafting of

---

[2] We emphasize that nothing in this opinion limits the scope of liability with respect to government enforcement actions, whether civil or criminal in nature.  This opinion relates only to actions under Rule 10b-5 brought by private individuals.

[3] Although the SEC urges us to adopt a so-called "creator standard," it takes no position on whether the allegations in the complaint are sufficient to maintain a cause of action under that standard against Mayer Brown or Collins.  SEC Br. at 5.  We note at the outset that the SEC's views on the scope of the *judicially created* implied right of action available under § 10b and Rule 10b-5 are entitled to little or no deference.  *See Piper v. Chris-Craft Indus., Inc.*, 430 U.S. 1, 42 n.27 (1977) ("[The SEC's] presumed 'expertise' in the securities-law field is of limited value when the narrow legal issue is one peculiarly reserved for judicial resolution, namely whether a cause of action should be implied by judicial interpretation in favor of a particular class of litigants.  Indeed, in our prior cases relating to implied causes of action, the Court has understandably not invoked the 'administrative deference' rule, even when the SEC supported the result reached in the particular case.").

false statements cannot be liable absent explicit attribution at the time of dissemination. Without attribution, defendants contend, secondary actors do not commit a primary violation of Rule 10b-5(b) and their conduct amounts, at most, to aiding and abetting.

Analyzing the parties' claims requires a brief history of the attribution requirement in our Circuit. Although we have often held that attribution is required for secondary actors to incur liability, we have for certain other defendants imposed no attribution requirement. *Compare Wright v. Ernst & Young LLP*, 152 F.3d 169, 174-75 (2d Cir. 1998) (requiring attribution for outside accountant defendants), *and Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 155 (2d Cir. 2007) (same), *with In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 75-76 (2d Cir. 2001) (not requiring attribution for corporate insider defendant). Upon reviewing this history and the guidance provided by the Supreme Court, we conclude that attribution is required for secondary actors to be liable in a private damages action for securities fraud under Rule 10b-5.

### A. History of the Attribution Requirement

The distinction between primary liability under Rule 10b-5 and aiding and abetting became especially important after the Supreme Court's 1994 decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994). That case involved the issuance of bonds by a public building authority and plaintiffs' allegations that Central Bank of Denver, the indenture trustee for the bond issues, aided and abetted the issuer in committing securities fraud by agreeing to delay an independent appraisal of the real property securing the bonds. *Id.* at 167-68. After reviewing the text and history of § 10(b), the Supreme Court concluded that "the 1934 [Exchange Act] does not itself reach those who aid and abet a § 10(b) violation." *Id.* at 177. To hold otherwise, it explained, would be to "impose . . . liability when at least one element critical for recovery under 10b-5 is absent: reliance." *Id.* at 180.

10

Despite holding that Rule 10b-5 liability does not extend to aiders and abettors, the Supreme Court acknowledged that "secondary actors" could, in some circumstances, still be liable for fraudulent conduct. *Id.* at 191. Specifically, the Court explained that

> [a]ny person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5, assuming *all* of the requirements for primary liability under Rule 10b-5 are met. In any complex securities fraud, moreover, there are likely to be multiple violators . . . .

*Id.* (citation omitted).

We considered the effect of *Central Bank* on private securities litigation against secondary actors in *Shapiro v. Cantor*, 123 F.3d 717 (2d Cir. 1997). *Shapiro* involved claims against the accounting firm Deloitte & Touche and its predecessor-in-interest for alleged complicity in the deceptive conduct of a limited partnership. *Id.* at 718-19. We held that plaintiffs failed to state a claim for a primary violation of securities laws against Deloitte & Touche because

> [a]llegations of "assisting," "participating in," "complicity in" and similar synonyms used throughout the complaint all fall within the prohibitive bar of *Central Bank*. A claim under § 10(b) must allege a defendant has made a material misstatement or omission indicating an intent to deceive or defraud in connection with the purchase or sale of a security.

*Id.* at 720-21 (footnote omitted); *see also id.* at 720 ("[I]f *Central Bank* is to have any real meaning, a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b). Anything short of such conduct is merely aiding and abetting, and no matter how substantial that aid may be, it is not enough to trigger liability under Section 10(b)." (quoting *In re MTC Elec. Techs. Shareholders Litig.*, 898 F. Supp. 974, 987 (E.D.N.Y. 1995))).

The principle that *Central Bank* requires the attribution of false statements to the defendant at the time of dissemination first appeared in our 1998 decision in *Wright v. Ernst & Young LLP*, 152

11

F.3d at 175. *Wright* involved claims against the accounting firm Ernst & Young and allegations that

the firm orally approved a corporation's false and misleading financial statements, which were

subsequently disseminated to the public. *Id.* at 171.

We explained that, after *Central Bank*, courts had generally adopted either a "bright line" test

or a "substantial participation" test to distinguish between primary violations of Rule 10b-5 and

aiding and abetting:

> "Some courts have held that a third party's review and approval of documents containing fraudulent statements is not actionable under Section 10(b) because one must make the material misstatement or omission in order to be a primary violator. *See, e.g.*, *In re Kendall Square Research Corporation Securities Litigation*, 868 F. Supp. 26, 28 (D. Mass. 1994) (accountant's 'review and approval' of financial statements and prospectuses insufficient); *Vosgerichian v. Commodore International*, 862 F. Supp. 1371, 1378 (E.D. Pa. 1994) (allegations that accountant 'advised' and 'guid[ed]' client in making allegedly fraudulent misrepresentations insufficient).

> Other courts have held that third parties may be primarily liable for statements made by others in which the defendant had significant participation. *See, e.g.*, *In re Software Toolworks*, 50 F.3d 615, 628 n.3 (9th Cir. 1994) (accountant may be primarily liable based on its 'significant role in drafting and editing' a letter sent by the issuer to the SEC); *In re ZZZZ Best Securities Litigation*, 864 F. Supp. 960, 970 (C.D. Cal. 1994) (an accounting firm that was 'intricately involved' in the creation of false documents and their 'resulting deception' is a primary violator of section 10(b))."

*Id.* at 174-75 (quoting *MTC Elec.*, 898 F. Supp. at 986) (alterations omitted). We noted that, in

*Shapiro*, we had followed the "bright line" approach. *Id.* We therefore held that "a secondary actor

cannot incur primary liability under [Rule 10b-5] for a statement not attributed to that actor at the

time of its dissemination." *Id. Wright* also made clear that attribution is necessary to satisfy the

reliance element of a private damages action under Rule 10b-5. *Id.* ("Reliance only on

representations made by others cannot itself form the basis of liability." (alteration and internal

quotation marks omitted)). Because the misrepresentations on which plaintiffs' claims were based

12

were not attributed to Ernst & Young, we held that the complaint failed to state a claim under Rule 10b-5. *Id.*

Despite *Wright*'s seemingly clear requirement that false statements be attributed to the defendant, our subsequent decisions may have created uncertainty or ambiguity with respect to when attribution is required. In 2001, in *In re Scholastic Corp. Securities Litigation*, we held that a corporate officer could be liable for misrepresentations made by the corporation, notwithstanding the fact that none of the statements at issue were specifically attributed to him. 252 F.3d at 75-76. We explained that as "vice president for finance and investor relations" the defendant "was primarily responsible for Scholastic's communications with investors and industry analysts. He was involved in the drafting, producing, reviewing and/or disseminating of the false and misleading statements issued by Scholastic during the class period." *Id.* On that basis, we allowed plaintiffs' claims against the defendant to proceed. Our opinion in *Scholastic* did not rely on, or even cite, *Wright* or *Central Bank* and contained no discussion of the distinction between primary violations of Rule 10b-5 and aiding and abetting.

Since *Scholastic*, district courts in our Circuit have struggled to reconcile its holding with our earlier holding in *Wright*. *See, e.g., In re Warnaco Group, Inc. Sec. Litig.*, 388 F. Supp. 2d 307, 314-15 n.3 (S.D.N.Y. 2005) (distinguishing *Scholastic* from *Wright* on the ground that the former involved "a corporate insider rather than an outside actor"), *aff'd sub nom. Lattanzio*, 476 F.3d 147; *Global Crossing Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 331 (S.D.N.Y. 2004) (Lynch, *J.*) (discussing the tension between *Wright* and *Scholastic* and noting that "*Scholastic* might indicate some relaxation of *Wright*'s [attribution] requirement"). Several of our decisions have also held that corporate officers can be liable for false information provided to and disseminated by analysts, even if no statements are attributed to the corporate officers themselves. *See Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004); *Novak v.*

13

*Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000). Like *Scholastic*, these cases did not cite *Wright* or *Central Bank*.

Notwithstanding this uncertainty we recently confirmed the importance of attribution for claims against secondary actors. In 2007, in *Lattanzio v. Deloitte & Touche*, we considered claims that the accounting firm Deloitte & Touche had, *inter alia*, reviewed and approved false or misleading quarterly statements issued by a public company. 476 F.3d at 151-52. We held that "to state a § 10b claim against an issuer's accountant, a plaintiff must allege a misstatement that is attributed to the accountant 'at the time of its dissemination,' and cannot rely on the accountant's alleged assistance in the drafting or compilation of a filing." *Id.* at 153 (quoting *Wright*, 152 F.3d at 174). We explained that imposing liability on accountants who review and approve misleading statements would be contrary to *Wright*'s rejection of the "substantial participation" test. *Id.* at 155. Because the claims against Deloitte & Touche were not based on the "accountant's articulated statement," we held that Rule 10b-5 liability did not extend to the defendants. *Id.* at 154 ("Under *Central Bank*, Deloitte is not liable for merely assisting in the *drafting* and filing of the quarterly statements." (emphasis added)).

### B.      Creator Standard v. Attribution Standard

Plaintiffs and the SEC urge us to adopt a "creator" standard that would require us to hold that a defendant can be liable for *creating* a false statement that investors rely on, regardless of whether that statement is attributed to the defendant at the time of dissemination. They argue that their proposed standard is consistent with the law of the Circuit. They distinguish *Wright* and *Lattanzio* on the ground that the defendants in those cases were not alleged to have created the false statements in question, but rather, merely reviewed false statements created by others. Plaintiffs and

14

the SEC contend that, notwithstanding the broad language that suggests attribution is always required, these cases are best read as holding that a defendant can be liable if he or she creates a false or misleading statement *or* allows a false statement to be attributed to him or her. Their position finds some support in *dicta* from one of our recent cases. *See United States v. Finnerty*, 533 F.3d 143, 150 (2d Cir. 2008) (describing *Wright* as holding that "under *Central Bank*, a defendant 'cannot incur primary liability' for a statement neither made by him *nor* 'attributed to [him] at the time of its dissemination'" (emphasis added) (quoting *Wright*, 152 F.3d at 175)).

Notwithstanding the *dicta* in *United States v. Finnerty*, we reject the creator standard for secondary actor liability under Rule 10b-5. An attribution requirement is more consistent with the Supreme Court's guidance on the question of secondary actor liability. Furthermore, a creator standard is indistinguishable from the "substantial participation" test that we have disavowed since *Wright*, and it is incompatible with our stated preference for a "bright line" rule. *See Wright*, 152 F.3d at 175.

Accordingly, secondary actors can be liable in a private action under Rule 10b-5 for only those statements that are explicitly attributed to them. The mere identification of a secondary actor as being involved in a transaction, or the public's understanding that a secondary actor "is at work behind the scenes" are alone insufficient. *See Lattanzio*, 476 F.3d at 155. To be cognizable, a plaintiff's claim against a secondary actor must be based on that actor's own "articulated statement," or on statements made by another that have been *explicitly* adopted by the secondary actor. *See id.*

### 1. Attribution Is Consistent with *Stoneridge*

The Supreme Court has never directly addressed whether attribution at the time of dissemination is required for secondary actors to be liable in a private damages action brought

15

pursuant to Rule 10b-5.  Nevertheless, the Court's recent decision in *Stoneridge* is instructive.

The Supreme Court's focus on reliance in *Stoneridge* favors a rule, such as attribution, that is designed to preserve that element of the private right of action available under Rule 10b-5.  *See Wright*, 152 F.3d at 175 (noting that an attribution requirement prevents plaintiffs from "circumvent[ing] the reliance requirements of the [Exchange] Act.").  In *Stoneridge*, which dealt primarily with deceptive conduct rather than false statements, the Court rejected claims brought pursuant to Rule 10b-5 against an issuing firm's customers and suppliers.  552 U.S. at 153.  The Court held that plaintiffs' claims failed as a matter of law because plaintiffs could not demonstrate that they "rel[ied] upon [defendants'] *own* deceptive conduct" and because "[i]t was [the issuing firm] Charter, not [defendants], that misled its auditor and filed fraudulent financial statements."  *Id.* at 160-61 (emphasis added); *id.* at 159 ("Reliance by the plaintiff upon *the defendant's* deceptive acts is an essential element of the § 10b private cause of action." (emphasis added)).  We think that reasoning is consistent with an attribution requirement in the context of claims based on false statements.  If a plaintiff must rely on a secondary actor's *own* deceptive conduct to state a claim under Rule 10b-5(a) and (c), it stands to reason that a plaintiff must also rely on a secondary actor's *own* deceptive statements—and not on statements conveyed to the public through another source and not attributed to the defendant—to state a claim under Rule 10b-5(b).

More generally, *Stoneridge* stands for the proposition that reliance is the critical element in private actions under Rule 10b-5.  This general proposition, applied to the specific issue of secondary actor liability, further supports an attribution requirement.  Attribution is necessary to show reliance.  Where statements are publicly attributed to a well-known national law or accounting firm, buyers and sellers of securities (and the market generally) are more likely to credit the accuracy of those statements.  Because of the firm's imprimatur, individuals may be comforted by the

16

supposedly impartial assessment and, accordingly, be induced to purchase a particular security. Without explicit attribution to the firm, however, reliance on that firm's participation can only be shown through "an indirect chain . . . too remote for liability." *Stoneridge*, 552 U.S. at 159.

### 2. Attribution Is Consistent with Our "Bright Line" Approach

The creator standard championed by plaintiffs and the SEC cannot be reconciled with our unambiguous rejection of a "substantial participation" test in favor of a bright line rule. In *Wright*, we noted that some courts applying a substantial participation test had imposed liability on secondary actors based on their "significant role in *drafting* and editing" false documents or their "'intricate[ ] involv[ment]' in the *creation* of false documents." *See Wright*, 152 F.3d at 175 (emphases added) (quoting a district court's description of *In re Software Toolworks*, 50 F.3d 615, 628 n.3 (9th Cir. 1994) and *In re ZZZZ Best Securities Litigation*, 864 F. Supp. 960, 970 (C.D. Cal. 1994)). We went on to explain, however, that the Second Circuit had rejected a substantial participation test in favor of a bright line rule. *Id.*

A creator standard is effectively indistinguishable from a substantial participation test. According to the SEC, the creator standard would extend liability to secondary actors who "supplied the writer with false or misleading information" or "'caused' a false or misleading statement to be made"—even if the statement disseminated to the public made no mention of the defendant. SEC Br. at 7, 10.[4] As we explained in *Lattanzio*, however, a "[p]ublic understanding that [a secondary actor] is at work behind the scenes does not create an exception to the requirement that an actionable misstatement be made by the [secondary actor]" and "[u]nless the public's understanding is based on the [secondary actor's] *articulated statement*, the source for that understanding . . . does not

---

[4] In many circumstances a creator standard would be even *less* rigorous than the substantial participation test, insofar as a defendant could incur liability for almost *any* involvement in the creation of false statements, not merely "substantial," "significant," or "intricate" involvement.

17

matter." 476 F.3d at 155 (emphasis added). Insofar as a creator standard would impose liability on secondary actors, such as defendants here, for their role in drafting and editing false documents on behalf of an issuing firm, it would mark a radical departure from our precedents.

An attribution requirement, on the other hand, is consistent with our preference for a bright line rule distinguishing primary violations of Rule 10b-5 from aiding and abetting. *See Wright*, 152 F.3d at 175 (explaining that, "[i]n *Shapiro*, we followed the 'bright line' test"). An attribution requirement makes clear—to secondary actors and investors alike—that those who sign or otherwise allow a statement to be attributed to them expose themselves to liability. Those who do not are beyond the reach of Rule 10b-5's private right of action. A creator standard establishes no clear boundary between primary violators and aiders and abettors, and it is uncertain what level of involvement might expose an individual to liability. Even the SEC struggles to define the precise contours of the creator standard, noting that a person "would *arguably* not cause a misstatement where he merely gave advice to another person regarding what was required to be disclosed and then that person made an independent choice to follow the advice." SEC Br. at 10-11 (emphasis added).

A bright line rule such as an attribution requirement also has many benefits in application. An attribution requirement is relatively easy for district courts to apply and avoids protracted litigation and discovery aimed at learning the identity of each person or entity that had some connection, however tenuous, to the creation of an allegedly false statement. Furthermore, as the Supreme Court has explained, securities law is "an area that demands certainty and predictability." *Central Bank*, 511 U.S. at 188 (quoting *Pinter v. Dahl*, 486 U.S. 622, 652 (1988)). Uncertainty can lead to many undesirable consequences, "[f]or example, newer and smaller companies may find it difficult to obtain advice from professionals. A professional may fear that a newer or smaller

18

company may not survive and that business failure would generate securities litigation against the professional, among others." *Id.* at 189. Uncertainty also increases the costs of doing business and raising capital. *See* Ralph K. Winter, *Paying Lawyers, Empowering Prosecutors, and Protecting Managers: Raising the Cost of Capital in America*, 42 Duke L.J. 945, 962 (1993) (describing "the need to avoid overbroad and amorphous doctrine and to craft legal rules with *bright lines* as a means of reducing the cost of capital" and explaining that "[o]verbreadth and uncertainty deter beneficial conduct and breed costly litigation" (emphasis added)), *cited with approval in Central Bank*, 511 U.S. at 189[5]; *see also Central Bank*, 511 U.S. at 188 ("[A] shifting and highly fact-oriented disposition of the issue of who may be liable for a damages claim for violation of Rule 10b-5 is not a satisfactory basis for a rule of liability imposed on the conduct of business transactions." (internal quotation marks and brackets omitted)). A creator standard would inevitably lead to uncertainty regarding the scope of Rule 10b-5 liability and potentially deter beneficial conduct. *See* Winter, *ante*, at 963 ("[O]verdeterrence in regulating capital markets . . . will deter activity that we wish to encourage.").

For the foregoing reasons, we conclude that even if *Wright* and *Lattanzio* were not read explicitly to require attribution in every case, an attribution requirement is most consistent with our Circuit's preference for a bright line approach to the question of secondary actor liability. Accordingly, we reject the creator standard advanced by plaintiffs and the SEC and we reaffirm our jurisprudence in *Wright* and *Lattanzio*—namely, that "a secondary actor cannot incur primary liability under [Rule 10b-5] for a statement not attributed to that actor at the time of its dissemination." *Wright*, 152 F.3d at 175; *see Lattanzio*, 476 F.3d at 154 ("Under *Central Bank*, [a secondary actor] is

---

[5] Judge Winter has explained that prosecutors and regulators (including the SEC) have often favored rules that "would have rendered capital markets less, rather than more, efficient." *See* Winter, *ante*, at 962 (explaining that "[t]he culture of prosecutors in these areas of law is to seek rules that are palpably overbroad so that they have a broad arsenal of weapons to use against suspected wrongdoers").

19

not liable for merely assisting in the drafting and filing of [allegedly false statements].").[6]

## C.    Application of the Attribution Requirement

Applying the attribution standard to the alleged false and misleading statements in this case, we conclude that the District Court properly dismissed plaintiffs' Rule 10b-5(b) claims against Mayer Brown and Collins.  No statements in the Offering Memorandum, the Registration Statement, or the IPO Registration Statement are attributed to Collins, and he is not even mentioned by name in any of those documents.  Accordingly, plaintiffs cannot show reliance on any of Collins' statements.  *See Lattanzio*, 476 F.3d at 154; *Wright*, 152 F.3d at 175 (imposing liability on secondary actors absent attribution "would circumvent the reliance requirement of [§ 10b]").

The Offering Memorandum and the IPO Registration Statement note that Mayer Brown, among other counsel, represented Refco in connection with those transactions but neither document attributes any particular statements to Mayer Brown.  Mayer Brown is not identified as the author of any portion of the documents.   Nor can the mere mention of the firm's representation of Refco be considered an "articulated statement" by Mayer Brown adopting Refco's statements as its own.  *See Lattanzio*, 476 F.3d at 155.  Absent such attribution, plaintiffs cannot show reliance on any statements of Mayer Brown.  *See id.* at 154; *Wright*, 152 F.3d at 175.

## II.    Plaintiffs' Rule 10b-5(a) and (c) Claims ("Scheme Liability")

The District Court dismissed plaintiffs' Rule 10b-5(a) and (c) claims on the ground that the

---

[6] Because this appeal does not involve claims against corporate insiders, we intimate no view on whether attribution is required for such claims or whether *Scholastic* can be meaningfully distinguished from *Wright* and *Lattanzio*. There may be a justifiable basis for holding that investors rely on the role corporate executives play in issuing public statements even in the absence of explicit attribution. *Lattanzio* confirmed, however, that, at least with respect to secondary actor liability, *Scholastic* did not relax *Wright*'s attribution requirement. *See Lattanzio*, 476 F.3d at 155 ("Public understanding that an accountant is at work behind the scenes does not create an exception to the requirement that an actionable misstatement be made by the accountant.  Unless the public's understanding is based on the accountant's *articulated statement*, the source for that understanding . . . does not matter." (footnote omitted) (emphasis added)).

Supreme Court's decision in *Stoneridge* foreclosed plaintiffs' theory of "scheme liability."  We agree

with the District Court and we adopt its careful analysis of plaintiffs' claims brought pursuant to

Rule 10b-5(a) and (c).  *See In re Refco*, 609 F. Supp. 2d at 314-19.

In *Stoneridge*, plaintiffs sought to hold two companies liable for their participation in sham

transactions that allowed an issuer of securities to overstate its revenue.  552 U.S. at 153-55.

Although the defendants' conduct was deceptive and enabled the issuer to conceal the

misrepresentations in its financial statements, the Supreme Court found that the essential element of

reliance was absent.  *Id.* at 159.  It explained that

> [defendants'] deceptive acts were not communicated to the public.  No member of
> the investing public had knowledge, either actual or presumed, of [defendants']
> deceptive acts during the relevant times.  [Plaintiffs], as a result, cannot show reliance
> upon any of [defendants'] actions except in an indirect chain that we find too remote
> for liability.

*Id.*; *see also id.* at 161 ("It was Charter, not [defendants], that misled its auditor and filed fraudulent

financial statements; nothing [defendants] did made it necessary or inevitable for Charter to record

the transactions as it did.").

Like the defendants in *Stoneridge*, Mayer Brown and Collins are alleged to have facilitated

sham transactions that enabled Refco to conceal the true state of its financial condition from

investors.  As in *Stoneridge*, plaintiffs were not aware of those transactions and, in fact, plaintiffs

explicitly disclaim any knowledge of defendants' involvement.  Confidential J.A. 300 ("In ignorance

of the fraudulent conduct of Collins [and] Mayer Brown . . . Plaintiffs and the other members of the

Class purchased Refco securities . . . .").  Accordingly, as the District Court explained, plaintiffs "did

not rely on[ ] any of Mayer Brown's work on the fraudulent loan transactions" and they failed to

state a claim for primary liability under Rule 10b-5.  *In re Refco*, 609 F. Supp. 2d at 315.

21

Plaintiffs attempt to distinguish *Stoneridge* by arguing that (1) defendants' deceptive conduct was communicated to the public; (2) defendants' conduct made it "necessary or inevitable" that Refco would misstate its finances, *see Stoneridge*, 552 at 161; and (3) defendants' conduct occurred in the "investment sphere," *see id.* at 166 (noting that the deceptive transactions "took place in the marketplace for goods and services, not in the investment sphere"). None of these purported distinctions is persuasive.

As explained above, plaintiffs admit that they were unaware of defendants' deceptive conduct or "scheme" at the time they purchased Refco securities. Under *Stoneridge*, it does not matter that those transactions were "reflected" in Refco's financial statements. 550 U.S. at 160. The Supreme Court explicitly rejected the argument that "investors rely not only upon the public statements relating to a security but also upon the transactions those statements reflect." *Id.* (noting that "there is no authority for this rule"). Accordingly, the fact that the sham transactions (or "scheme") allegedly facilitated by Mayer Brown and Collins rendered Refco's public financial disclosures false or misleading does not materially distinguish this case from *Stoneridge*.[7]

We recognize that, after *Stoneridge*, it is somewhat unclear how the deceptive conduct of a secondary actor could be communicated to the public and yet remain "deceptive." What is clear from *Stoneridge*, however, is that the mere fact that the ultimate result of a secondary actor's deceptive course of conduct is communicated to the public through a company's financial statements is insufficient to show reliance on the secondary actor's *own* deceptive conduct. Because that is all plaintiffs have alleged here, we are bound by the Supreme Court's holding in *Stoneridge*.

Furthermore, nothing about Mayer Brown's or Collins' actions made it necessary or

---

[7] Nor does the fact that defendants allegedly drafted those disclosures alter the analysis. As explained above, none of Refco's allegedly false statements was attributed to Mayer Brown or Collins. Defendants' role in preparing those documents therefore adds nothing to plaintiffs' claim of reliance.

22

inevitable that Refco would mislead investors. As the District Court aptly noted, unlike in *Stoneridge*, "the Mayer Brown Defendants were not even the counter-party to the fraudulent transactions; they merely participated in drafting the documents to effect those transactions." *In re Refco*, 609 F. Supp. 2d at 316. We therefore agree that, "[a]s was the case in *Stoneridge*, it was Refco, not the Mayer Brown Defendants, that filed fraudulent financial statements; nothing the Mayer Brown Defendants did made it necessary or inevitable for Refco to record the transactions as it did." *Id.* (quoting *Stoneridge*, 552 U.S. at 160) (internal quotation marks, brackets, and ellipsis omitted).

Finally, the fact that defendants' conduct arguably occurred in the "investment sphere" is not dispositive or materially relevant. Although *Stoneridge* acknowledged the dangers of expanding liability to "the whole marketplace in which the issuing company does business," 550 U.S. at 160, the Court's opinion was primarily focused on whether investors were aware of, and relied on, the defendants' own conduct. This understanding is consistent with our recent opinion in *United States v. Finnerty*, which relied on *Stoneridge* to hold that a securities professional—a specialist trader on the New York Stock Exchange—could not be liable under §10(b) absent some evidence that he conveyed a misleading impression to customers. 533 F.3d at 149. *Finnerty* undermines any assertion that *Stoneridge* is inapplicable to conduct that occurs in the "investment sphere."

For the foregoing reasons, we agree with the District Court that plaintiffs' Rule 10b-5(a) and (c) claims for "scheme liability" are foreclosed by the Supreme Court's decision in *Stoneridge*.

## III. Section 20(a) Liability

Any claim for "control person" liability under § 20(a) of the Exchange Act[8] must be

---

[8] Section 20(a) provides as follows:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the

predicated on a primary violation of securities law. 15 U.S.C. § 78t(a) (imposing liability on those who "control[ ] any person liable" for securities fraud); *see, e.g.*, *Rombach*, 355 F.3d at 177-78. Because we hold that plaintiffs failed to state a claim for a primary violation against the defendants, we also hold that the District Court properly dismissed their § 20(a) claim against Mayer Brown.

## IV.    Plaintiffs' Request for Leave to Amend

For the first time on appeal, plaintiffs request the opportunity to amend their complaint to include facts discovered since their original complaint was filed. Plaintiffs do not disclose to us those recently discovered facts and there is therefore no basis for suggesting, much less concluding, that plaintiffs could amend their claims against Mayer Brown and Collins in a way that would make them viable. *See Nat'l Union of Hosp. & Health Care Employees v. Carey*, 557 F.2d 278, 282 (2d Cir. 1977) ("Absent some indication as to what appellants might add to their complaint in order to make it viable, we see no reason to grant appellants relief in this Court which was not requested below." (citation omitted)). Accordingly, we decline to grant plaintiffs leave to amend.

## CONCLUSION

To summarize, we hold:

(1) Secondary actors, such as defendants, can be held liable in a private damages action brought pursuant to § 10(b) and Rule 10b-5(b) only for false statements attributed to the secondary actor at the time of dissemination;

(2) Plaintiffs' claims for "scheme liability" brought pursuant to § 10(b) and Rule 10b-5(a) and

---

controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

24

(c) are foreclosed by the Supreme Court's decision in *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008);

(3) Because plaintiffs cannot establish a primary violation by the defendants, the District Court properly dismissed their claim for "control person" liability under § 20(a) of the Exchange Act; and

(4) Plaintiffs' request for leave to amend their complaint is denied.

Accordingly, the judgment of the District Court is **AFFIRMED**.

Barrington D. Parker, *Circuit Judge*, concurring.

The panel's opinion does an admirable job with a formidable task–distilling a theory of Rule 10(b) liability for secondary actors from our precedents. Therefore, I concur in Judge Cabranes's careful and comprehensive opinion. Nonetheless, even after this opinion, I fear that our Circuit's law in this area is far from a model of clarity. Our decisions in *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998), and *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 155-56 (2d Cir. 2007), both hold that secondary actors are not liable to investors where the allegedly misleading statements were not attributed to the defendants. However, after *Wright*, we issued *In Re Scholastic Corp. Securities Litigation*, 252 F.3d 63, 75-76 (2d Cir. 2001), where we concluded that a corporate vice president could be liable for being "involved" in disseminating misleading statements, without requiring public attribution of the statements to him. It is true that the defendant in *Scholastic Corp.* was a corporate insider, rather than an outside accountant or lawyer. However, the court did not distinguish *Wright* on that basis; indeed, it did not cite *Wright* at all. At least one district court in this Circuit interpreted *Scholastic Corp.* to say that we had relaxed *Wright*'s attribution requirement. *See In Re Global Crossing, Ltd. Sec. Lit.*, 322 F. Supp. 2d 319, 331-33 (S.D.N.Y. 2004) (Lynch, *J.*). Subsequently, we reaffirmed a strict attribution requirement in *Lattanzio*, without mentioning *Scholastic Corp.* Finally, in *United States v. Finnerty*, we interpreted *Wright* to mean that a defendant "cannot incur primary liability for a statement neither made by him nor attributed to him at the time of its dissemination," language which one could interpret to suggest that strict attribution is not necessary. 533 F.3d 143, 150 (2d Cir. 2008) (quotation marks omitted).

While our own precedent appears to be not invariably consistent, our sibling circuits have debated sharply whether an attribution requirement is necessary under *Central Bank of Denver, N.A., v. First Interstate Bank of Denver*, N.A., 511 U.S. 164 (1994). *Compare Anixter v. Home-Stake*

*Prod. Co.*, 77 F.3d 1215, 1226 (10th Cir. 1996) *and SEC v. Wolfson*, 539 F.3d 1249, 1258-60 (10th Cir. 2008) (rejecting an attribution requirement) *with Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1205 (11th Cir. 2001) (adopting an attribution requirement). In an amicus brief submitted in this case, the SEC takes the position that a creator standard is fully consistent with *Central Bank of Denver*. Moreover, it argues that an attribution requirement would prevent the securities laws from deterring individuals who make false statements anonymously or through proxies. The SEC also observes that private plaintiffs who bring securities claims already face significant hurdles–they must prove that the defendants knew the falsity of their statements, and as a result of the Private Securities Litigation Reform Act, must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The Appellants in our case argue with some force against a result that shields Mayer Brown from damages in a circumstance where the partner responsible for the misleading statements was criminally convicted and received a prison term of seven years. *See* Amended Judgment, *United States of America v. Collins*, No. 1:07-cr-01170 (S.D.N.Y. Mar. 24, 2010).

In light of the importance of the existence, *vel non*, of an attribution requirement to the securities laws, the bar, and the securities industry, this case could provide our full Court, as well as, perhaps, the Supreme Court, with an opportunity to clarify the law in this area.