LOHIER, Circuit Judge,
concurring in part and dissenting in part:
Although I agree with the majority’s resolution of the state-law fraud claims against Isaac Dweck (“Dweck”), I respectfully dissent from the majority’s disposition of the federal securities claim of market manipulation against Dweck. In my view, the plaintiffs sufficiently pleaded such a claim by alleging that (1) Dweck participated in a manipulative scheme in which he conveyed to the investing public, through a series of securities transactions, false signals that he controlled securities that were in fact controlled by a boiler room, A.R. Baron (“Baron”), (2) these false signals distorted the market for the relevant securities, and (3) they relied on an assumption of an efficient market free of *26 manipulation in buying the relevant securities.
The majority opinion takes at least three wrong turns as it navigates the complaint and the relevant legal landscape. First, it ignores the fact that Dweck is alleged to be an insider of Baron who has primary liability under Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder, for engaging in a manipulative scheme. Instead, it interprets the complaint to state a claim only for aiding and abetting securities fraud. Second, it conflates market manipulation claims and pure misrepresentation claims. Third, it misreads Janus Capital Group, Inc. v. First Derivative Traders, — U.S. -, 131 S.Ct. 2296, 180 L.Ed.2d 166 (2011), and Stoneridge Investment Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008), to require a direct communication of false information to the plaintiffs in the context of a claim of market manipulation.
As the Supreme Court explained in Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,
[t]he absence of § 10(b) aiding and abetting liability does not mean that secondary actors in the securities markets are always free from liability under the securities Acts. Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5.
511 U.S. 164, 191, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) (emphasis added). The Court in Central Bank also highlighted the distinction between “those who do not engage in the manipulative or deceptive practice,” and those “who aid and abet the violation.” Id. at 167, 114 S.Ct. 1439. “[AJiding and abetting liability reaches persons who do not engage in the proscribed activities at all, but who give a degree of aid to those who do.” Id. at 176, 114 S.Ct. 1439. In other words, secondary actors who do more than aid and abet a securities fraud can be liable as primary violators. Neither the Supreme Court nor our precedents have modified the principle that an individual who “committed] a manipulative act” and thereby “participated in a fraudulent scheme” is a primary violator. SEC v. U.S. Envtl., Inc., 155 F.3d 107, 112 (2d Cir.1998).
Here, the plaintiffs claim that Dweck was a primary violator because he engaged directly in market manipulation. The Supreme Court has described market manipulation as a “term of art” in connection with securities markets that generally refers “to practices, such as wash sales; matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity.” Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 476, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). As I describe in greater detail below, the first amended complaint alleges that Dweck engaged in at least some of these manipulative practices directly.
The majority opinion itself aptly describes the purpose of the scheme involving Dweck and others as follows: “[TJhe market was principally a series of artificial trades orchestrated by Baron designed to create a false appearance of volume and of increasing price” so that “Baron and its co-conspirators [cjould sell their holdings at a profit before the stock crashed.” Majority Op. at 21. It required at least two bad actors to create the “false appearance” to the market described in the majority opinion, and Dweck is adequately alleged to be one of those actors engaged in the securities transactions at issue. See Stoneridge, 552 U.S. at 161, 128 S.Ct. 761. Indeed, Dweck is specifically alleged to have “au *27 thorized,” “engaged in” and “agreed to” the scheme, and one can plausibly conclude that, far from being a mere third-party agent or an enabler providing aid from the sidelines, he was central to the manipulation itself. See, e.g., J.A. at 320 (“As one of the founding investors and principal owners of A.R. Baron, Dweck played an important role in Baron’s operations. He provided substantial needed bridge financing for many of the Baron investments .... ”).
To the extent that the majority opinion superimposes the elements of a misrepresentation claim on a market manipulation claim and suggests that misrepresentation and market manipulation claims should be analyzed identically in this case, I respectfully disagree. Although both claims fall within the scope of conduct generally prohibited by Section 10(b), the pleading requirements for a claim of market manipulation differ from the pleading requirements for a misrepresentation claim. “Market manipulation requires a plaintiff to allege (1) manipulative acts; (2) damage; (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant’s use of the mails or any facility of a national securities exchange.” ATSI Commc’ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 101 (2d Cir.2007); Wilson v. Merrill Lynch & Co., Inc., 671 F.3d 120, 129 (2d Cir.2011). A misrepresentation claim, on the other hand, requires the plaintiff to allege “(1) a material representation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.” Stoneridge, 552 U.S. at 157, 128 S.Ct. 761; Pacific Inv. Mgmt. Co., LLC v. Mayer Brown LLP, 603 F.3d 144, 151 (2d Cir.2010).
The most relevant difference between the two claims relates to pleading reliance. A market manipulation claim permits the plaintiff to plead that it relied on an assumption of an efficient market free of manipulation, whereas a misrepresentation claim requires the plaintiff to allege reliance upon a misrepresentation or omission. Compare ATSI, 493 F.3d at 101, with Stoneridge, 552 U.S. at 157, 128 S.Ct. 761. In addition, “a claim of manipulation ... can involve facts solely within the defendant’s knowledge; therefore, ... the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim.” ATSI, 493 F.3d at 102.
These differences, among others, between claims based on market manipulation and those based on misrepresentation are essential to understanding why the Supreme Court’s analysis in Stoner-idge and Janus regarding reliance does not control the outcome in this case, and why the majority opinion is wrong to conclude that these cases foreclose the market manipulation claim against Dweck.
Our Court has recognized that the fraud-on-the-market doctrine “creates a presumption that (1) misrepresentations by an issuer affect the market price of securities traded in an open market, and (2) investors rely on the market price of securities as an accurate measure of their intrinsic value.” In re Salomon Analyst Metromedia Litig., 544 F.3d 474, 483 (2d Cir.2008) (emphasis in original). In a Section 10(b) misrepresentation claim premised on the fraud-on-the-market theory, it is the misrepresentation that affects the market price of securities. Id. In comparison, participants in market manipulation schemes engage in fraudulent transactions in the public market for securities. The *28 market manipulators’ “own deceptive conduct,” Stoneridge, 552 U.S. at 160, 128 S.Ct. 761, affects the market price of securities traded in the market,[1] ATSI, 493 F.3d at 101 (market manipulation requires “market activity” that “create[s] a false impression of how market participants value a security”). For this reason, in a market manipulation claim based on a fraud-on-the-market theory, the complaint must allege that the manipulative acts of each principal participant in the scheme communicate false pricing signals to the market, which in turn transmits the false pricing information to investors. See Basic Inc. v. Levinson, 485 U.S. 224, 244, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (describing theory of reliance based on fraud-on-the-market theory and explaining that “[w]ith the presence of a market, the market is interposed between seller and buyer and, ideally, transmits information to the investor in the processed form of market price”). The relevant analysis, therefore, is whether a defendant has engaged in a manipulative “transaction [that] sends a false pricing signal to the market,” ATSI, 493 F.3d at 100, or “eonvey[s] a misleading impression” to the investing public, United States v. Finnerty, 533 F.3d 143, 149 (2d Cir.2008). If so, we presume that the market acts as the intermediary in communicating that false signal or conveying that false impression to investors.
With these principles in mind, I conclude that permitting the plaintiffs to proceed with their claim against Dweck by pleading reliance based on these false communications to the market is entirely consistent with the holdings in Stoneridge and Janus, neither of which disavows a theory of reliance based on the fraud-on-the-market doctrine. See Stoneridge, 552 U.S. at 159, 128 S.Ct. 761 (“[U]nder the fraud-on-the-market doctrine, reliance is presumed when the statements at issue become public. The public information is reflected in the market price of the security. Then it can be assumed that an investor who buys or sells stock at the market price relies upon the statement.” (citing Basic, 485 U.S. at 247, 108 S.Ct. 978)); In re Salomon Analyst Metromedia Litig., 544 F.3d at 481. In Stoneridge, the Supreme Court affirmed the trial court’s dismissal of a claim alleging a fraudulent scheme because the defendants’ “deceptive acts were not communicated to the public. No member of the investing public had knowledge, either actual or presumed, of [defendants’] deceptive acts during the relevant times.” 552 U.S. at 159, 128 S.Ct. 761. Moreover, the scheme in Stoneridge involved potentially fraudulent transactions “in the marketplace for goods and services, not,” as with Dweck’s alleged market manipulation, “in the investment sphere.” Id. at 166, 128 S.Ct. 761. Janus, too, involved discrete misrepresentations relating to the defendants’ business operations, rather than a market manipulation scheme such as the one alleged here. Specifically, the plaintiffs in Janus alleged that certain mutual fund prospectuses included fraudulent misrepresentations indicating that the funds “were not suitable for market timing” and would avoid that practice. 131 S.Ct. at 2300.
According to the majority opinion, Ston-eridge held that “a plaintiff must allege that the specific defendant was identified as making the pertinent misrepresentation(s).” Majority Op. at 24 (citing Stoner- *29 idge, 552 U.S. at 158-59, 128 S.Ct. 761). Stoneridge, of course, did no such thing. Ultimately, the claims in both Stoneridge and Janus failed because the defendants in each case did not communicate any false statement or misrepresentation directly to the investing public, and the “deceptive acts” of the defendants in Stoneridge were “too remote to satisfy the requirement of reliance.” Stoneridge, 552 U.S. at 161, 128 S.Ct. 761. Stock manipulation, however, necessarily and directly communicates false information through the market and goes beyond a false statement. See ATSI, 493 F.3d at 101 (market manipulation requires “market activity” that[1] “create[s] a false impression of how market participants value a security”); GFL Advantage Fund, Ltd. v. Colkitt, 272 F.3d 189, 207 (3d Cir.2001) (identifying manipulative conduct as transactions that “injeet[ ] false inaccurate information into the marketplace or ereate[ ] a false impression of supply and demand”).
I have not been able to find a single federal case that has applied Stoneridge or Janus to foreclose a claim against an actor alleged to have engaged directly in market manipulation of securities. Yet, relying on Stoneridge and Janus, the majority opinion does so by mistakenly focusing on who actually communicated the false price to the plaintiffs and viewing the answer to that question as dispositive. See Majority Op. at 25 (“The present complaint alleges only that Baron and Bear Stearns communicated the artificial price information to the would-be buyers”). In doing so, however, the majority opinion ignores the fraud-on-the-market doctrine — a doctrine that, as I have explained, clearly remains a viable method for establishing reliance after Stoneridge and Janus — and wrongly suggests that Stoneridge and Janus require a direct communication of either a false statement or deceptive conduct to specific plaintiffs in every case in order for those plaintiffs to state a claim under Section 10(b) or Rule 10b-5. Cf. U.S. SEC v. Landberg, 836 F.Supp.2d 148, 153-54 (S.D.N.Y.2011) (concluding that Janus does not require dismissal of a complaint that “plausibly alleges that [the defendant] violated Rule 10b-5 beyond the making of a statement” by participating in a manipulative scheme).
The plaintiffs have pleaded a market manipulation claim against Dweck based on a theory of reliance that both Stoner-idge and Janus appear to embrace. In their first amended complaint, plaintiffs allege that Dweck effectively was a founder, principal, and owner of Baron, which was indisputably an archetypal boiler room.[2] They also allege that Dweck was a key participant in the manipulative scheme who actively engaged in several prearranged, riskless trades, among other things, that resulted in his purchase of securities (warrants) pursuant to an agreement with Baron. There is no question that the prearranged securities trades were illegal. Moreover, as alleged, they were, designed to deceive by directly giving the public the false impression that Dweck, not Baron, controlled the relevant manipulated securities.
The first amended complaint also explains the impact that the Baron/Dweck manipulative scheme had on the market and on the plaintiffs: ■
6. ... During all times relevant hereto, defendants ... initiated and/or joined in a course of conduct that was designed to and did, (a) manipulate and artificially inflate the market prices of the Manipu *30 lated Securities in excess of their market price during the relevant period; (b) deceive the investing public, including, in particular, plaintiffs, regarding the fundamental attributes, market prices and future prospects of the Manipulated Securities; (c) cause plaintiffs to purchase the Manipulated Securities at manipulated and artificially inflated prices; and (d) thereby caused plaintiffs damage.
10. Defendant! ] Isaac R. Dweck ... also engaged in parking transactions with the purpose and effect of creating a false appearance of an active trading market with the intent of inflating the trading price of the Manipulated Securities and causing investors, such as plaintiffs to purchase the Manipulated Securities.
21. The various fraudulent techniques were designed to, and did, create a price “mirage” which deceived Baron customers into believing that the securities were trading in an active, liquid, bona fide market, and to inflate the market price of the Manipulated Securities. Baron then used those inflated prices to fraudulently convince customers to make further purchases.
131. Parking misled regulators and customers about the amount of Baron Stocks in Baron’s own inventory, and fictitiously improved Baron’s net capital.... The placement of such stock also artificially maintained the price of the Manipulated Stocks. The “parking” was done with the purpose and had the effect of creating a false impression in the minds of Baron customers of the value and liquidity of the “parked” securities and induced Baron customers, including plaintiffs, to make investments based on Baron’s illusion of trading activity. 293. ... [E]ach of the Plaintiffs relied [sic] the belief that they were transacting business in a bona fide active, liquid securities market, rather than an illiquid, manipulated and fraudulent market.
319. ... Defendants’ fraudulent and manipulative activities as described herein created the appearance that the price at which the Manipulated Securities traded reflected bona fide supply and demand in a freely functioning market. The increasing prices of the Manipulated Securities appeared to indicate increasing value, placed by the market, on the business underlying the securities. Thus, ... the appearance of an active, rising market induced plaintiffs to purchase those securities in reliance upon the “wisdom of the marketplace.”
J.A. at 241, 243, 247, 281, 331, 340 (emphasis added).
I agree that the plaintiffs could have done a better job of drafting the complaint. But that is neither the standard of review nor the standard for a motion to dismiss. The plaintiffs have adequately and plausibly alleged that Dweck personally engaged in a stock manipulation scheme that affected the prices of the relevant manipulated securities. See Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (describing requirement of “facial plausibility”). As alleged, Dweck’s conduct constitutes more than “aid” or “facilitation”; under any fair reading of the complaint, Dweck was up to his eyeballs in the fraud at its inception. The plaintiffs have also adequately and plausibly alleged that they acted in reliance on an assumption of an efficient market free of manipulation when they purchased the securities at artificially inflated prices. In the context of a claim for market manipulation, and at this stage in the proceedings, these allegations are enough. See ATSI, 493 F.3d at 101 (an allegation that the plaintiffs’ injuries were “caused by reliance on an assumption *31 of an efficient market free of manipulation” will suffice to establish causation).
Notwithstanding the availability of criminal penalties and civil enforcement by the Securities and Exchange Commission, see Majority Op. at 25, I fear that every market manipulator — the remaining Dwecks of the world — will be cheered by the extra shelter for stock manipulation under the federal securities laws that the majority opinion unnecessarily provides them. If I thought that Stoneridge or Janus required that result, I would shrug, concur, and move on. Because I conclude that neither case forecloses the federal claim of market manipulation against Dweck, I respectfully dissent.

. If true, the allegations relating to Dweck describe a classic market manipulator. As the majority opinion acknowledges, he is alleged to have participated in prearranged stock transactions with no risk of loss that were completed for the sole purpose of artificially increasing the trading volume and the prices of the manipulated securities. Majority Op. at 23-24.

. Indeed, A.R. Baron's reputation as an illegal boiler room is well established. See David E.Y. Sarna, History of Greed: Financial Fraud from Tulip Mania to Bemie Madoff 315 (2010).