**HAWAII IRONWORKERS ANNUITY TRUST FUND, Plaintiff**

v.

**Bernard N. COLE, et al., Defendants.**

**No. 3:10CV371.**

United States District Court,
N.D. Ohio,
Western Division.

Sept. 4, 2013.

Jack Landskroner, Landskroner Grieco Merriman, Cleveland, OH, Maureen E. Mueller, Darren J. Robbins, Debra J. Wyman, James E. Barz, Laurie L. Largent, Michael J. Dowd, Robbins Geller Rudman & Dowd, San Diego, CA, for Plaintiff.

Carl E. Poli, Michael L. Siegel, Stone, McGuire & Siegel, Northbrook, IL, Theodore M. Rowen, Spengler Nathanson, Catherine H. Killam, Greenfield, Killam & Frank, Toledo, OH, Ralph DeNune, III, Lydy & Moan, Sylvania, OH, Randall S. Levine, Levine & Levine, Kalamazoo, MI, for Defendants.

## ORDER

JAMES G. CARR, Senior District Judge.

This is a securities fraud case brought by a purchaser of Dana Corporation securities against four of Dana's former corporate officers. Plaintiff Hawaii Ironworkers Annuity Trust Fund (the Fund) alleges defendants Bernard N. Cole, William E. Hennessey, Dennis W. Hodge, and Robert E. Steimle engaged in a scheme to defraud the investing public by artificially inflating the value of Dana securities.

Jurisdiction is proper under 15 U.S.C. § 78aa and 28 U.S.C. § 1331.

Pending is the Fund's motion for class certification. (Doc. 148). For the following reasons, I deny the motion.

### Factual Background

Dana supplies automotive parts and drive-train systems for light, commercial, and off-highway vehicles. At all relevant times, defendant Cole was the President of one of Dana's main business groups, the Heavy Vehicle Technologies and Systems Group (Heavy Vehicle Group). Defendants Hodge and Hennessey each served as a Vice President of the Heavy Vehicle Group. Hodge also acted as the Heavy Vehicle Group's Controller, while Hennessey was also the General Manager of the Heavy Vehicle Group's Commercial Vehicle Systems division (CVS). Defendant Steimle was the Controller of CVS.

In February, 2004, Dana reported a 220% increase in its net income for fiscal year 2003. That report marked a turnaround for the company, which had failed to meet prior earnings projections.

In April, Dana's management announced that the company's restructuring and cost-reduction efforts had resulted in "growth in [ ] gross margins." (Doc. 1 at ¶ 4). Management claimed that these efforts would keep Dana profitable despite the rising cost of steel, an important raw material in Dana's business.

During fiscal year 2004, Michael Burns, the recently-hired Chairman and Chief Executive Officer of Dana, and Robert Richter, Dana's Chief Financial Officer, instructed Dana's plants and business divisions to post six-percent increases in their respective profit margins. To ensure Dana would not miss current earnings projections, Burns and Richter allegedly exerted substantial pressure on defendants to increase profits within CVS.

The Fund asserts defendants responded to that pressure by devising a massive accounting fraud to inflate CVS's earnings reports and engaging in sham transactions to give an air of legitimacy to those reports.

Among other things, defendants allegedly: 1) recognized income on sales without transferring assets and/or the risk of loss to purchasers; 2) recognized revenue from unilateral price increases imposed on Dana customers without those customers' agreement; 3) ordered CVS personnel to issue "debit memos"—a type of invoice purporting to reduce amounts owed to CVS suppliers—without a contractual basis for the claimed reductions; and 4) failed to record steel surcharges. Although many of defendants' practices violated Generally Accepted Accounting Principles (GAAP) and Dana's own revenue-recognition standards, defendants attested that CVS's financial results were accurate and GAAP-compliant.

While the accounting scheme was allegedly in progress, Dana issued a press release in February, 2005, stating that the Heavy Vehicle Group posted $61 million in earnings before taxes and interest (EBIT) during the fourth quarter of fiscal year 2004.

Dana issued similar press releases in April and July, 2005, highlighting the Heavy Vehicle Groups' EBIT for the first and second quarters of fiscal year 2005. The July, 2005, release noted that "[t]he Heavy Vehicle Technologies and Systems Group continued to benefit from strong commercial and off-highway markets. Its sales grew by 21 percent in the second quarter compared to the same period last year[.]" (Doc. 1 at ¶ 75).

However, on September 15, 2005, Dana announced that it would "likely" restate its financial results from the second quarter of fiscal year 2005, "primarily to correct inappropriate recognition of price increases in its Commercial Vehicle business[.]" (*Id.* at ¶ 78). After this disclosure, Dana's stock price dropped by twenty percent.

On October 10, 2005, Dana announced that investors should not rely on its financial statements for fiscal year 2004 and the first half of fiscal year 2005. Revisions to those statements were necessary, the company acknowledged, to "correct issues involving customer pricing and transactions with suppliers in [its] Commercial Vehicle Business." (*Id.* at ¶ 82). Thereafter, the price of Dana's stock fell thirty-five percent, and the price of its debt securities dropped ten percent.

When Dana restated its financial statements for fiscal year 2004 and the first half of fiscal year 2005, it eliminated $44 million

in EBIT. Dana filed for bankruptcy in March, 2006.

### Procedural Background

The Fund brought this suit in 2010, alleging defendants violated § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5. The Fund alleged that defendants: 1) made false statements in violation of Rule 10b–5(b); and 2) engaged in a deceptive scheme in violation of Rule 10b–5(a) and (c). *See Hawaii Ironworkers Annuity Trust Fund v. Cole,* 2011 WL 1257756, *4–6 (N.D.Ohio 2011) (*Ironworkers I* ).

I initially denied defendants' motion to dismiss complaint, *see id.,* but I reconsidered my ruling as to the Rule 10b–5(b) claim in light of *Janus Capital Group v. First Derivative Traders,* — U.S. ——, 131 S.Ct. 2296, 180 L.Ed.2d 166 (2011). I concluded that, because the complaint did not allege that defendants had ultimate authority over the false statements contained in Dana's press releases, defendants could not be liable for violating Rule 10b–5(b). *Hawaii Ironworkers Annuity Trust Fund v. Cole,* 2011 WL 3862206, *2–5 (N.D.Ohio 2011) (*Ironworkers II* ). Accordingly, only the Rule 10b–5(a) and (c) claim—sometimes referred to as a "scheme liability" claim—remains.

The Fund now moves to certify a class of all persons who purchased Dana's publicly traded securities between February 23, 2005, and October 7, 2005. The Fund also seeks designation as class representative and appointment of its attorneys, Robbins Geller Rudman & Dowd, as class counsel.

Defendants oppose certification on grounds that: 1) the Fund's claims are not typical of other class members' claims; 2) the Fund will not adequately represent the class; and 3) individual questions on the reliance element of the putative class members' claims will predominate because the fraud-on-the-market presumption is inapplicable

### Discussion

■ "The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal–Mart Stores, Inc. v. Dukes,* — U.S. ——, 131 S.Ct. 2541, 2550, 180 L.Ed.2d 374 (2011). "[T]o justify a departure from

that rule" and obtain class certification, the Fund must satisfy all requirements of Rule 23(a) and one requirement of Rule 23(b). *Id.*

Under Rule 23(a), the Fund must prove: 1) the proposed class is so numerous that joinder of all members is impracticable; 2) common questions of law or fact exist; 3) its claims are typical of the class members' claims; and 4) it will fairly and adequately protect the interests of the class. *See* Fed. R.Civ.P. 23(a). These requirements "ensure[ ] that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate." *Wal–Mart, supra,* — U.S. at ——, 131 S.Ct. at 2550.

Because the Fund brings its motion under Rule 23(b)(3), it must also prove: 1) "questions of law or fact common to class members predominate over any questions affecting only individual members;" and 2) "a class action is superior to other available methods for fairly and efficiently resolving the controversy." Fed.R.Civ.P. 23(b)(3).

■ Rule 23 "does not set forth a mere pleading standard." *Comcast Corp. v. Behrend,* — U.S. ——, 133 S.Ct. 1426, 1432, 185 L.Ed.2d 515 (2013). On the contrary, the Fund "must affirmatively demonstrate [its] compliance with the Rule." *Wal–Mart, supra,* — U.S. at ——, 131 S.Ct. at 2552. For that reason, I cannot take the Fund's allegations in support of certification as true; instead I must "rigorous[ly] anal[yze]" whether the Fund has carried its burden. *Id.*

In this case, the dispositive question is whether the Fund proved that common questions predominate over questions affecting only individual class members. Accordingly, I limit my analysis to the Rule 23(b)(3) inquiry.

### A. Predominance

■ "Considering whether questions of law or fact common to class members predominate begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund v. Halliburton,* — U.S. ——, 131 S.Ct. 2179, 2184, 180 L.Ed.2d 24 (2011).

■ The Fund's claim arises under § 10(b) and Rule 10b–5(a) and (c), the elements of which are: 1) a deceptive act in

furtherance of a scheme to defraud; 2) scienter; 3) a connection between the deceptive act and the purchase or sale of a security; 4) reliance; 5) economic loss; and 6) loss causation. *Stoneridge Inv. Partners v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008); *Brown v. Kinross Gold, USA*, 343 F.Supp.2d 957, 963 (D.Nev.2004).

■ Here, as in many securities fraud class actions, whether common questions will predominate turns on the reliance element. The most direct way to prove reliance "is by showing that [the plaintiff] was aware of a company's statement and engaged in a relevant transaction[.]" *Halliburton, supra,* —— U.S. at ——, 131 S.Ct. at 2184. "In that situation, the plaintiff plainly would have relied on the company's misrepresentation." *Id.*

■ However, in *Basic, Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), the Supreme Court recognized that "limiting proof of reliance [to direct reliance] would place an unnecessarily unrealistic evidentiary burden on the Rule 10b–5 plaintiff who has traded on an impersonal market." *Halliburton, supra,* —— U.S. at ——, 131 S.Ct. at 2185. The Court also observed that "[r]equiring proof of individualized reliance from each member of the proposed plaintiff class effectively would [prevent plaintiffs] from proceeding with a class action, since individual issues" of reliance would overwhelm issues common to the class. *Basic, supra,* 485 U.S. at 242, 108 S.Ct. 978. To overcome this problem the Court permits plaintiffs seeking class certification to invoke a rebuttable presumption of reliance under the fraud-on-the-market theory. *Halliburton, supra,* —— U.S. at ——, 131 S.Ct. at 2185.

The Fund relies solely on the fraud-on-the-market presumption in arguing that it can prove reliance on a class-wide basis—and thus that common questions will predominate. Defendants argue that the presumption is unavailable because the Fund has not shown that the deceptive conduct alleged in the complaint was: 1) material; 2) disclosed to the public; or 3) publicly attributed to defendants.

## 1. Materiality

■ After defendants filed their opposition to class certification, the Supreme Court held that a securities fraud plaintiff need not prove materiality at the class-certification stage. *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds,* —— U.S. ——, 133 S.Ct. 1184, 1198–1199, 185 L.Ed.2d 308 (2013). As the Court explained, a class's "inability to prove materiality would not result in individual questions predominating." *Id.* at 1191. Rather, because "the question of materiality ... is an objective one [that] can be proved through evidence common to the class," materiality is a "common question for purposes of Rule 23(b)(3)." *Id.* at 1195.

Because the materiality of defendants' conduct has no bearing on the Rule 23(b)(3) analysis, the Fund need not prove materiality at this stage of the case.

## 2. Public Disclosure

■ The fraud-on-the-market theory presumes that "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." *Basic, supra,* 485 U.S. at 246, 108 S.Ct. 978. Because the market "transmits information to the investor in the processed form of a market price," an investor presumptively "relies on public misstatements whenever he buys or sells stock at the price set by the market." *Halliburton, supra,* —— U.S. at ——, 131 S.Ct. at 2185.

■ A plaintiff seeking to invoke the presumption of reliance "must demonstrate that the alleged misrepresentations were publicly known (else how would the market take them into account?)." *Halliburton, supra,* —— U.S. at ——, 131 S.Ct. at 2185; *see also Stoneridge, supra,* 552 U.S. at 159, 128 S.Ct. 761 ("reliance is presumed when the statements at issue become public").

The Fund contends that it satisfies the public-disclosure requirement because the deceptive conduct at issue—"defendants' falsification of Dana's financial results"—was communicated to the public "through Dana's required quarterly press releases and financial reports." (Doc. 173 at 36). Those documents draw attention to substantial profit

increases within the Heavy Vehicle Group and CVS. However, the documents neither mention defendants nor refer to any of the deceptive conduct in which they allegedly engaged.

Defendants argue that, because their conduct was not publicly disclosed, the Fund cannot invoke the fraud-on-the-market theory. According to defendants, the Fund must prove the deceptive conduct itself—as opposed to the end result of that conduct (*i.e.,* the false earnings reports)—became public. Accordingly, while defendants do not dispute that the end result of their alleged fraud reached the market, they contend that "there was nothing in Dana's public statements or in its SEC filings that identified any conduct by Defendants." (Doc. 153 at 12).

### a. Disclosure of Deceptive Conduct or End Result of That Conduct

▇ As discussed, the fraud-on-the-market theory is a substitute for direct reliance on a defendant's deceptive conduct. "Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action." *Stoneridge, supra,* 552 U.S. at 160, 128 S.Ct. 761. "It ensures that, for liability to arise, the requisite causal connection between a defendant's [misconduct] and a plaintiff's injury exists as a predicate for liability." *Id.*

While cases like *Basic, Halliburton,* and *Amgen* underscore the importance of the public-disclosure component, those cases involved misrepresentation claims under Rule 10b–5(b), rather than scheme liability claims under Rule 10b–5(a) and (c). Thus, they do not answer the question this case presents: whether the deceptive conduct itself must be disclosed publicly, or whether it is sufficient that the end result of that conduct reaches the public.

The Court's decision in *Stoneridge, supra,* 552 U.S. at 156, 128 S.Ct. 761, leads to the answer to this question. In that case the Court considered "when, if ever, an injured investor may rely upon § 10(b) to recover from a party that," like defendants here, "neither makes a public misstatement nor violates a duty to disclose but does participate in a scheme to violate § 10(b)."

Plaintiffs in *Stoneridge,* a class of investors in Charter Communications, brought a scheme liability claim against two of Charter's suppliers, defendants Scientific Atlanta and Motorola. *Id.* at 155, 128 S.Ct. 761. The complaint alleged defendants agreed to participate in a series of sham transactions with Charter even though they "knew or were in reckless disregard of Charter's intention to use the transactions to inflate its revenues and knew the resulting financial statements issued by Charter would be relied upon by analysts and investors." *Id.*

The Supreme Court held that plaintiffs could not invoke the fraud-on-the-market presumption because defendants' "deceptive acts were not communicated to the public," and, consequently, "[n]o member of the investing public had knowledge, either actual or presumed, of [defendants'] deceptive acts during the relevant times." *Id.* at 159, 128 S.Ct. 761. Because defendants' deceptive acts "were not disclosed to the investing public," the Court concluded they were "too remote to satisfy the requirements of reliance." *Id.* at 161, 128 S.Ct. 761.

The Court also found it insufficient, for purposes of the reliance element, that defendants' deceptive conduct enabled Charter to make false statements in its publicly released financial statements:

> In effect [plaintiffs] contend[ ] that in an efficient market investors rely not only upon the public statements relating to a security but also upon the transactions those statements reflect. Were this concept of reliance to be adopted, the implied cause of actions would reach the whole marketplace in which the issuing company does business; and there is no authority for this rule.

*Id.* at 160, 128 S.Ct. 761.

▇ The decision in *Stoneridge* thus stands for the proposition that, to invoke the fraud-on-the-market in a scheme liability case, a plaintiff must establish that a defendant's deceptive conduct was publicly disclosed. Absent disclosure of that conduct to the public, there is no basis either to: 1) conclude that the market took the deceptive conduct into account in pricing a security; or 2) presume that individual class members relied on that conduct when buying or selling the security.

Having determined the proper legal standard, I now turn to whether the Fund established that defendants' "deceptive acts were ... communicated to the public." *Id.* at 159, 128 S.Ct. 761.

### b. Investing Public's Knowledge of Defendants' Deceptive Conduct

The Fund argues I have already found that defendants' scheme was communicated to the investing public. It relies on my rulings denying defendants' motion to dismiss and motion for reconsideration, where I concluded that "defendants' deceptive acts ... were communicated to the public through Dana's press releases[.]" *Ironworkers II, supra,* 2011 WL 3862206, *6 n. 7.

Defendants acknowledge those rulings but argue that they are inapplicable at the class-certification stage. This is so, defendants claim, because in ruling on the motion to dismiss, I was required to view the complaint in the light most favorable to the Fund, accept all well-pled allegations of deceptive conduct as true, and draw all reasonable inferences in the Fund's favor. In contrast, defendants argue, Rule 23 requires that I rigorously analyze the record to determine whether the deceptive conduct alleged in the complaint was made public. *Wal–Mart, supra,* — U.S. at ——, 131 S.Ct. at 2552.

The Fund replies that accepting defendants' argument would involve taking an impermissible look at the merits of its claims. Specifically, it argues that "what conduct was undertaken to falsify [the Heavy Vehicle Group's and CVS's] financial statements, whether defendants engaged in it and whether they had the required fraudulent intent are simply not factual issues that must be resolved ... to determine whether the fraud-on-the-market presumption is available." (Doc. 173 at 27).

### i. Prior Rulings on Defendants' Motion to Dismiss

Critical to my decision in *Ironworkers I,* 2011 WL 1257756, *8, that defendants' deceptive acts were communicated to the public was "the fact that Dana drew particular attention to the success of the Heavy Vehicle Group" in press releases Dana issued in 2005. I explained:

defendants provided false information that Dana not only incorporated into its financial reports but also highlighted in public statements. The information defendants gave to Dana played a major role in falsely inflating public reports of the company's overall and (remarkable) financial success during a very challenging period. These circumstances, and the direct nexus they show between the defendants' fraudulent conduct and the publication of false information to the investing public differentiates this case from *Stoneridge* [.]

\* \* \*

Viewed ... most favorably to [the Fund], the complaint [suggests] that those [at Dana] who spoke directly to the investment public merely conveyed to the public the defendants' conduct that was at the heart of the fraud.

*Id.*

 Now that the case is at the class-certification stage, I may no longer accept at face-value the Fund's claim that Dana's press releases conveyed defendants' deceptive conduct to the public. Instead, as defendants correctly argue, I must conduct a "rigorous analysis" to determine whether the Fund proved that the deceptive conduct was communicated to the public. *See Comcast, supra,* — U.S. at ——, 133 S.Ct. at 1432; *Wal–Mart, supra,* — U.S. at ——, 131 S.Ct. at 2552.

The Fund's contention that this inquiry requires an impermissible look at the merits of its claim is unavailing. To begin, Rule 23(b) and Supreme Court precedent require the Fund to prove all prerequisites for class-certification—and here those prerequisites include public awareness of the deceptive scheme. *Halliburton, supra,* — U.S. at ——, 131 S.Ct. at 2185; *Stoneridge, supra,* 552 U.S. at 159–161, 128 S.Ct. 761.

More to the point, the Fund is mistaken that the analysis requires me to determine "[w]hat conduct was undertaken to falsify the financial statements, whether defendants engaged in it and whether they has the required fraudulent intent." (Doc. 173 at 37). Rather, I simply assume defendants engaged in the conduct alleged in the complaint and

ask whether that conduct was disclosed to the public, such that: 1) the market took defendants' conduct into account in pricing Dana's securities; and 2) the fact-finder can presume the Fund relied on defendants' conduct when purchasing Dana securities.

For these reasons, my decision denying defendants' motion to dismiss, which I based on a lower standard of review, does not control my resolution of the Rule 23(b) inquiry.

### ii. The Fund's Evidence of Public Disclosure

■ The question now arises whether the Fund has shown that defendants' deceptive acts were "communicated to the public." *Stoneridge, supra,* 552 U.S. at 160, 128 S.Ct. 761.

As alleged in the complaint, defendants' deceptive conduct includes, *inter alia:* 1) issuing debit memos to Dana suppliers that reduced the amounts payable to the suppliers; 2) negotiating and entering into "one-off" sales transactions allowing Dana to retain possession of equipment it purportedly sold while recognizing millions of dollars of revenue; 3) recognizing revenue on price increases to which Dana's customers had not agreed; and 4) delaying the recording of steel surcharges incurred in the ordinary course of Dana's business. *See Hawaii Ironworkers v. Cole,* 2013 WL 3147974, *4–5 (N.D.Ohio 2013) (*Ironworkers III* ).

The only evidence the Fund cites to show public disclosure of these acts are three Dana press releases. In general, the press releases announced the Heavy Vehicle Group's EBIT during certain portions of fiscal years 2004 and 2005. One of the press releases, issued in July, 2005, specifically referred to defendants' business unit, noting that the Heavy Vehicle Group's profits were up twenty-one percent due to "strong commercial and off-highway markets." (Doc. 1 at ¶ 75).

But it is undisputed that the press releases say nothing about the deceptive conduct in which defendants themselves allegedly engaged. The documents do not mention, for example, the "one-off" transactions that defendants allegedly negotiated, or that the Heavy Vehicle Group reduced its expenses through appropriate use of debit memos. Because the press releases do not refer to the deceptive conduct in which defendants allegedly engaged, they are insufficient to communicate that conduct to the public. *Stoneridge, supra,* 552 U.S. at 159–160, 128 S.Ct. 761.

The Fund is left to argue that Dana's press releases, in announcing the Heavy Vehicle Group's strong performance, necessarily disclosed the deceptive conduct that enabled Dana to publicly misrepresent its financial health. But that contention is inconsistent with *Stoneridge, supra,* which rejected the argument "that in an efficient market investors rely not only upon public statements relating to a security but also upon *the transactions those statements reflect."* *Id.* at 160, 128 S.Ct. 761.

After *Stoneridge,* other district courts have also concluded that a public misrepresentation does not necessarily disclose the underlying deceptive conduct that allowed a company to make that misrepresentation. *See In re Smith Barney Transfer Agent Litig.,* 884 F.Supp.2d 152, 162–163 (S.D.N.Y.2012) (no reliance where plaintiffs did not allege knowledge of defendants' deceptive conduct but claimed "that they reasonably expected Defendants would act with uncompromising fidelity and loyalty" to investors); *In re Parmalat Sec. Litig.,* 570 F.Supp.2d 521, 525–526 (S.D.N.Y.2008) (no reliance where "nothing about [the securities issuer's public] disclosures describes any of defendants' own conduct, much less conduct that was deceptive"); *Abbate v. Wells Fargo Bank, N.A.,* 2011 WL 9698215, *4–5 (C.D.Cal.2011) (no reliance where "[p]laintiffs do not allege that [publicly released documents] detail Defendants' allegedly improper activity").

Finally, my conclusion is consistent with the two Circuit Court cases most closely (though not exactly) on point: *Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP,* 603 F.3d 144 (2d Cir.2010) (*PIMCO* ), and *In re DVI, Inc. Sec. Litig.,* 639 F.3d 623 (3d Cir. 2011), *abrogated on other grounds by Amgen, supra,* —— U.S. at ——, 133 S.Ct. at 1194.

As relevant here, both *PIMCO* and *DVI* involved scheme liability claims against so-called "secondary actors"—"lawyers[,] accountants, or other parties who are not em-

ployed by the issuing firm whose securities are the subject of allegations of fraud." *PIMCO, supra,* 603 F.3d at 148 n. 1.

In *PIMCO,* defendant law firm allegedly "facilitated sham transactions that enabled [brokerage firm] Refco to conceal the true state of its financial condition." *Id.* at 159. In their complaint, plaintiffs admitted "they were unaware of defendants' deceptive conduct or 'scheme' at the time they purchased Refco securities." *Id.* Accordingly, the Second Circuit determined that plaintiffs did not rely on defendants' conduct. *Id.* at 159–160.

Like the Fund here, the *PIMCO* plaintiffs also argued that "defendants' deceptive conduct was communicated to the public" because it was "reflected in" Refco's public statements. *Id.* at 160. The Second Circuit rejected that argument as well:

> Under *Stoneridge,* it does not matter that those transactions were 'reflected' in Refco's financial statements. The Supreme Court explicitly rejected the argument that investors rely not only upon the public statements relating to a security but also upon the transactions those statements reflect. Accordingly, the fact that the sham transaction (or "scheme") allegedly facilitated by [defendants] rendered Refco's public financial disclosures false or misleading does not materially distinguish this case from *Stoneridge.*

*Id.* at 159; see also *id.* ("the mere fact that the ultimate result of a secondary actor's deceptive course of conduct is communicated to the public through a company's financial statements is insufficient to show reliance on the secondary actor's *own* deceptive conduct").

Plaintiffs in *DVI, supra,* 639 F.3d at 642, alleged that defendant law firm engaged in a series of sham transactions that allowed the DVI corporation to avoid disclosing its imperiled financial state. The district court found plaintiffs could not invoke the fraud-on-the-market presumption because "none of [the law firm's] alleged conduct was publicly disclosed such that it affected the market for DVI's securities." *Id.* at 643.

Affirming that ruling, the Third Circuit emphasized that whether the law firm's conduct "was actually publicly disclosed" is "a necessary prerequisite of the reliance pre-

sumption." *Id.* at 647. For that reason, the court held that "plaintiffs claims fail because they cannot demonstrate they relied on [the firm's] own deceptive conduct," which had not been disclosed to the investing public. *Id.* at 648.

The Fund urges me not to follow *PIMCO* and *DVI* because defendants in those cases were secondary actors, while defendants here were high-ranking executives within a key Dana business division. I agree that, on this score at least, *PIMCO* and *DVI* are distinguishable.

■ Nevertheless, both cases recognized that, absent public disclosure of a defendants' own deceptive conduct, the market cannot have taken that conduct into account when pricing the company's securities. *See DVI, supra,* 639 F.3d at 643 (affirming district court's judgment that fraud-on-the-market presumption was inapplicable "because none of [defendant's] alleged conduct was publicly disclosed such that it affected the market for DVI's securities"); *PIMCO, supra,* 603 F.3d at 159. The Fund cites no authority dispensing with the public-disclosure requirement when the defendant is a high-ranking executive within the issuing company, rather than a secondary actor.

As in *PIMCO* and *DVI,* the record contains no evidence that Dana alluded to the defendants' internally-cabined deceptive conduct, even though it pointed proudly to the effect of that conduct (namely, the earnings that defendants had fraudulently inflated). That Dana's public statements flowed from defendants' falsehoods and bogus reports does not satisfy the public-disclosure requirement as to them. *See Stoneridge, supra,* 552 U.S. at 160–161, 128 S.Ct. 761; *PIMCO, supra,* 603 F.3d at 159.

In a final effort to resist this conclusion, the Fund contends that defendants' conduct is more closely connected to the fraud than defendants' conduct in *Stoneridge, PIMCO,* and *DVI.* According to the complaint, defendants were the architects of a massive accounting fraud within the Heavy Vehicle Group. Accepting *arguendo* the complaint's allegations about them, defendants were primarily responsible for implementing the fraud and ensuring that the sham transac-

tions provided a veneer of legitimacy for the inflated numbers.

But whether "the causal connection between Defendants' deceptive acts and Plaintiffs' losses is proximately closer than the tenuous links rejected in *Stoneridge* and *PIMCO*" is not the dispositive question for purposes of the fraud-on-the-market theory. *Smith Barney, supra,* 884 F.Supp.2d at 163. "The fact that [defendants' own] conduct was 'not disclosed to the investing public,' [*Stoneridge,* 552 U.S. at 161, 128 S.Ct. 761], is what ma[kes] it too remote to invoke a presumption of reliance" in this case. *DVI, supra,* 639 F.3d at 647.[1]

In sum, I conclude defendants' deceptive conduct was not "communicated to the public." *Stoneridge, supra,* 552 U.S. at 158, 128 S.Ct. 761. Because their alleged fabrications and faithless acts remained hidden from the public, defendants are, under prevailing law, protected from individual liability on a classwide basis. As the law now stands, individual questions of reliance threaten to overwhelm questions common to the class. This case cannot proceed as a class action.

### Conclusion

For the reasons set forth above, it is

ORDERED THAT plaintiff's motion for class certification (Doc. 148) be, and the same hereby is denied.

The Clerk shall set a status/scheduling conference. The parties shall submit either separate or a joint agenda not later than the Friday before the conference, which counsel may attend by telephone.

So ordered.

---

1. Because the Fund has not shown that defendants' deceptive conduct became public, I express no opinion on defendants' argument that the Fund also needed to show that the deceptive conduct was specifically attributed to defendants when it became public.